**[J-46-2013]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 659 CAP |
| | : |
| Appellee | : Appeal from the Order entered on March |
| | : 28, 2012 in the Court of Common Pleas of |
| | : Delaware County, Criminal Division, at No. |
| v. | : CP-23-CR-0005045-1997 |
| | : |
| | : SUBMITTED:  April 29, 2013 |
| ARTHUR BOMAR, | : |
| | : |
| Appellant | : |

**OPINION**

**MADAME JUSTICE TODD**                    **DECIDED:   November 21, 2014**

In this capital case, Appellant Arthur Bomar appeals the order of the Court of Common Pleas of Delaware County denying his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.   For the reasons that follow, we affirm the order of the PCRA court.

**I.  Background**

The facts underlying Appellant's conviction and death sentence have been set forth at length by this Court in Appellant's direct capital appeal.  Commonwealth v. Bomar, 826 A.2d 831 (Pa. 2003) ("Bomar I").   A brief recitation of the facts is necessary, however, to provide context for Appellant's collateral challenge to his conviction and sentence in the instant appeal.

The evidence adduced at trial, and summarized in Bomar I, established that, on the night of June 19, 1996, 22-year-old Aimee Willard ("the victim") was socializing with

several of her friends at a bar located on Lancaster Avenue in Wayne, Pennsylvania. The victim left the bar alone at approximately 1:25 a.m. the following morning, and her blue Honda Civic was discovered shortly thereafter on the southbound off-ramp of the Springfield-Lima exit of Interstate 476 in Delaware County at approximately 2:00 a.m. No one was found inside the vehicle, but the driver's side door was open, the engine was running, and the interior lights and headlights were still on. A pool of blood was discovered in front of the vehicle, along with a tire iron, the victim's sneakers, and a pair of womens' underwear lined with a sanitary pad containing pubic hairs matching those of the victim.

Later that day, the victim's naked body was found face down in a vacant lot at 16th Street and Indiana Avenue in Philadelphia, with two plastic bags covering her head and a tree branch forced into her vagina. The victim sustained multiple blunt force injuries to her head, brain, and face, as well as various other contusions, fractures, and defensive wounds throughout her body. An intact, degenerate sperm was also recovered from the victim's vaginal cavity, and tire impressions were obtained from the scene.

The victim's murder remained unsolved for nearly a year, until June 5, 1997, when Appellant was arrested on an outstanding warrant for a parole violation from a prior second-degree murder conviction in Las Vegas, Nevada. Following his arrest, investigators questioned Appellant regarding the victim's murder, and he stated, *inter alia*, that he had been at the same bar as the victim on the night of her murder; that he drove a 1993 Ford Escort until March 1997 (the tires of which were later determined to match tire impressions taken from the murder scene); and that he routinely traveled on Interstate 476.

On July 10, 1997, Appellant's then-girlfriend, Mary Rumer, reported to state police that Appellant confessed to her that he murdered the victim, stating that Appellant told her

that he watched the victim leave the bar and get into her car, and followed her in his car, until he stopped her on Interstate 476, flashing a fake police badge. Rumer recounted that Appellant told her that, after he approached the vehicle, he knocked the victim unconscious, placed her in his car, and drove her to an abandoned building, where he removed the victim's clothes and hit her in the head with a hard object, killing her. Appellant also admitted to Rumer that he raped the victim, and he later showed Rumer the location on Interstate 476 where the victim's car had been abandoned, as well as the vacant lot where the victim's body was found.

Forensic evidence taken from Appellant's vehicle and the crime scene corroborated Rumer's story and further linked Appellant to the murder. Specifically, blood was recovered from the right front door panel of Appellant's Ford Escort, which matched the victim's DNA; the oil pan from the vehicle matched the pattern of a contusion on the right side of the victim's body; and, as noted, the tires on Appellant's vehicle were consistent with the tire patterns taken from the murder scene. DNA testing also established that Appellant's DNA profile matched the sperm recovered from the victim's vagina.

Additionally, while police were investigating Appellant's involvement in the murder, David O'Donald, Appellant's ex-brother in law, who was incarcerated in federal prison for unrelated offenses, offered to assist police with their investigation. Police transferred O'Donald to the Montgomery County Correctional Facility, where Appellant was held, for two weeks in July 1997, and placed him on Appellant's cellblock to serve as a listening post. On July 17, Appellant made several incriminating statements to O'Donald, including, *inter alia*, "we did whatever we wanted with her, she did whatever we told, and when we were done, I almost took her head off, and we crammed a tree branch up her cunt." Id. at 842. Quincy Jamal Williams, another inmate incarcerated with Appellant in

Montgomery County, also reported to police that Appellant confessed to murdering the victim.

Appellant was subsequently charged with first-degree murder, rape, aggravated assault, kidnapping, and abuse of a corpse. The case proceeded to a jury trial before the Honorable Frank T. Hazel of the Court of Common Pleas of Delaware County,[1] and, on October 1, 1998, Appellant was convicted of the aforementioned offenses. At the conclusion of the penalty hearing, the jury found three aggravating circumstances — the killing was committed in the perpetration of a felony,[2] Appellant had a significant history of felony convictions involving the use or threat of violence to the person,[3] and Appellant had been convicted of another murder committed before or at the time of the offense at issue.[4] The jury also found one mitigating circumstance — the "catchall" mitigator concerning Appellant's character and record.[5] After concluding the aggravating circumstances outweighed the mitigating circumstance, the jury returned a sentence of death. The trial court imposed the death sentence on December 4, 1998, and, after deeming Appellant a high-risk dangerous offender pursuant to 42 Pa.C.S.A. § 9714(a)(1),[6] sentenced Appellant to consecutive terms of 10 to 20 years incarceration

---

[1] Although the trial took place in Delaware County, upon Appellant's motion for change of venire, the jury was selected from Westmoreland County.

[2] 42 Pa.C.S.A. § 9711(d)(6).

[3] 42 Pa.C.S.A. § 9711(d)(9).

[4] 42 Pa.C.S.A. § 9711(d)(11).

[5] 42 Pa.C.S.A. § 9711(e)(8).

[6] At the time of Appellant's sentencing, 42 Pa.C.S.A. § 9714(a)(1) provided that:

> Any person who is convicted in any court of this Commonwealth of a crime of violence shall, if at the time of the commission of the current offense the person had previously been convicted of a crime of violence, and has not rebutted the presumption of high risk dangerous offender . . .
> be sentenced to a minimum sentence of at least ten years of

(continued…)

on both the rape and kidnapping convictions, as well as a consecutive term of one to two years on the abuse of a corpse conviction.

Following sentencing, a somewhat complicated procedural history ensued. Specifically, trial counsel withdrew from the case, and Steven C. Leach, Esquire, entered his appearance. Thereafter, on January 13, 1999, Appellant filed post-sentence motions raising, *inter alia*, four claims of ineffective assistance of trial counsel.[7] The trial court held hearings on the post-sentence motions on March 4, 1999 and April 20, 1999, and ultimately denied post-sentence relief, concluding in a written opinion that the claims lacked merit. Appellant subsequently appealed his judgment of sentence. On May 30, 2003, this Court affirmed Appellant's judgment of sentence of death, vacated Appellant's judgment of sentence for his remaining offenses, and remanded for resentencing in light of our decision in Commonwealth v. Butler, 760 A.2d 384 (Pa. 2000) (holding 42 Pa.C.S.A. § 9714(a)(1) violated procedural due process rights by placing the burden on the defendant to rebut the presumption that he is a high risk dangerous offender). Bomar I, 826 A.2d at 862.

Appellant then filed a timely *pro se* PCRA petition on January 20, 2004, which he styled as "Defendant's Motion to Support For Preserved Newly Discovered Evidence Through A PCRA Petition." On April 1, 2004, Appellant was resentenced on his

---

(…continued)
> total confinement, notwithstanding any other provision of this title or other statute to the contrary.

42 Pa.C.S.A. § 9714(a)(1). Section 9714(a)(1) was later amended, removing the "high risk dangerous offender" presumption and, instead, imposing an automatic ten-year minimum term of incarceration.

[7] Specifically, Appellant asserted trial counsel was ineffective for: (1) failing to call Appellant's mother and Betty Howell to testify on his behalf during the guilt phase of trial; (2) failing to present a diminished capacity defense; (3) failing to move for a second change of venue or venire; and (4) failing to request a continuance for additional neuropsychological testing at the penalty phase.

remaining non-capital convictions to an aggregate term of 252 to 504 months incarceration. Appellant appealed that judgment of sentence to the Superior Court. On December 22, 2004, while Appellant's appeal from resentencing was pending, counsel from the Federal Community Defender Office ("FCDO") for the Eastern District of Pennsylvania Capital Habeas Unit filed on Appellant's behalf a "Petition for Habeas Corpus Relief Pursuant to Article I, Section 14 of the Pennsylvania Constitution Statutory Post-Conviction Relief Under the Post-Conviction Relief Act, 42 Pa.C.S. § 9541 et seq.," which was deemed to be an amended PCRA petition. The PCRA proceedings were stayed pending the conclusion of Appellant's direct appeal. On May 25, 2005, the Superior Court affirmed Appellant's judgment of sentence on the remaining offenses, and this Court denied allocatur. Michael Wiseman, Esquire,[8] entered his appearance on February 3, 2006, and the stay of PCRA proceedings was lifted on February 23, 2006. Judge Hazel presided over the PCRA proceedings as well.

Nine months later, on November 21, 2006, Appellant's counsel filed a motion seeking an order declaring Appellant incompetent to proceed. Following a hearing on the matter and briefing by both parties, the PCRA court found Appellant competent and denied the motion on November 16, 2007. Thereafter, the Commonwealth filed a response to Appellant's PCRA petition on March 31, 2008, and evidentiary hearings on Appellant's petition took place on July 17, 2007, May 28, 2008, November 5-7, 2008, January 15-16, 2009, April 28-29, 2009, September 24, 2009, October 20-21, 2009, February 1-3, 2010, July 28, 2010, November 29, 2011, January 20, 2011, and November 29, 2011. The PCRA court ultimately denied Appellant's petition on March 28, 2012. Appellant filed a notice of appeal on April 23, 2012, and, on September 4, 2012, the PCRA court filed an extensive 213 page opinion addressing, and rejecting as

---

[8] Attorney Wiseman was also an attorney for the FCDO.

meritless, each of the 22 claims in Appellant's PCRA petition.[9]  Of those claims, he raises nine before us, which we now address *seriatim*.

## II.  Analysis

In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is "supported by the record and free of legal error."  Commonwealth v. Rainey, 928 A.2d 215, 223 (Pa. 2007).   To qualify for relief under the PCRA, an appellant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S.A. § 9543(a)(2); that his claims have not been previously litigated or waived; and that the failure to litigate the issue prior to or during trial or on direct appeal could not have been the result of any rational, strategic, or tactical decision by counsel.   Id. § 9543(a)(3), (a)(4).   An issue is previously litigated if "the highest appellate court in which [the appellant] could have had review as a matter of right has ruled on the merits of the issue."   Id. § 9544(a)(2).   An issue is waived if the appellant "could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding."   Id. § 9544(b).

Further, as several of Appellant's claims concern the ineffectiveness of counsel, we will briefly summarize the legal framework governing such claims under the PCRA. To obtain relief on a claim of ineffectiveness of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth in Strickland v. Washington, 466 U.S. 668 (1984).   In Pennsylvania, we have applied the Strickland test by requiring that a petitioner establish that:   (1) the underlying claim has arguable merit; (2) no reasonable

---

[9]  The PCRA court did not order Appellant to file a Pa.R.A.P. 1925(b) statement of matters complained of on appeal.

basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. Commonwealth v. Pierce, 786 A.2d 203, 213 (Pa. 2001). Counsel is presumed to have rendered effective assistance, and, if a claim fails under any required element of the Strickland test, the court may dismiss the claim on that basis. Commonwealth v. Ali, 10 A.3d 282, 291 (Pa. 2010).

Notably, at the time Appellant filed his post-sentence motions and direct appeal, he was subject to our rule articulated in Commonwealth v. Hubbard, 372 A.2d 687 (Pa. 1977), which required new counsel, upon pain of waiver, to raise claims of ineffectiveness at the earliest opportunity. Appellant's direct appeal was not decided, however, until after we issued our decision in Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002), wherein we abrogated the Hubbard rule and required that all ineffectiveness claims be deferred until post-conviction proceedings in order to provide an appellant with a more complete record and more time to discover and fully develop his or her claims. Grant, 813 A.2d at 737-38. Nevertheless, in Appellant's direct appeal, we found that such concerns were not implicated because Appellant's counsel properly raised and preserved his ineffectiveness claims in trial court, the trial court held hearings on Appellant's ineffectiveness claims, and the trial court issued an opinion addressing those claims. Bomar I, 826 A.2d at 853-54. Accordingly, because of the unique circumstances of Appellant's case and the fact that an extensive record already had been created to assist with our review, we created a limited exception to the general rule of deferral in Grant — subsequently deemed the "Bomar exception" [10] — and entertained Appellant's

---

[10] We recently reaffirmed Grant and limited the Bomar exception to its pre-Grant facts in Commonwealth v. Holmes, 79 A.3d 562 (Pa. 2013).

ineffectiveness claims on direct appeal, rather than deferring them until collateral review. Id. at 855.

Because Appellant had the opportunity to raise his ineffectiveness claims on direct appeal, Appellant has waived any new ineffectiveness claims that he did not raise at that time. See 42 Pa.C.S.A. § 9544(b) ("an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding"). Thus, Appellant may secure relief on claims of trial counsel ineffectiveness only if he can demonstrate not only that trial counsel was ineffective, but also that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness on direct appeal. In so doing, Appellant must plead, present argument on, and prove the Strickland/Pierce elements of ineffectiveness as to each relevant layer of representation. Ali, 10 A.3d at 292; Commonwealth v. McGill, 832 A.2d 1014, 1022 (Pa. 2003).

### A. Favorable Treatment Impeachment Evidence

In his first issue on appeal, Appellant raises prosecutorial misconduct and Brady claims, asserting the Commonwealth offered O'Donald and Williams "secret deals" in exchange for their testimony regarding incriminating statements that they overheard Appellant make while on his cell block; that O'Donald and Williams testified falsely at trial that no deals existed; and that the Commonwealth violated Brady[11] and Napue[12] by failing to disclose evidence regarding these deals to trial counsel and failing to correct the witnesses' allegedly false testimony during trial. Appellant additionally contends that, in

---

[11] Brady v. Maryland, 373 U.S. 83 (1963).
[12] Napue v. Illinois, 360 U.S. 264 (1959).

evaluating his claims, the PCRA court misapplied the materiality standard for relief under Brady and Napue.

To prove a Brady violation, Appellant must demonstrate that: (1) the prosecution concealed evidence; (2) which evidence was either exculpatory or impeachment evidence favorable to him and; (3) he was prejudiced by the concealment. Commonwealth v. Paddy, 800 A.2d 294, 305 (Pa. 2002); Strickler v. Greene, 527 U.S. 263, 281-82 (1999). In order to prove prejudice, Appellant must show a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Commonwealth v. Burke, 781 A.2d 1136, 1141 (Pa. 2001). Stated differently, the undisclosed evidence must be "material to guilt or punishment." Paddy, 800 A.2d at 305. Further, "[i]mpeachment evidence which goes to the credibility of a primary witness against the accused is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness." Commonwealth v. Strong, 761 A.2d 1167, 1175 (Pa. 2000). Mere conjecture as to an agreement between the prosecution and witness is insufficient to establish a Brady violation, however. Commonwealth v. Chmiel, 30 A.3d 1111, 1131 (Pa. 2011). Finally, we note that "[t]here is no Brady violation when the appellant knew, or with reasonable diligence, could have uncovered the evidence in question." Commonwealth v. Paddy, 15 A.3d 431, 451 (Pa. 2011).

## 1. David O'Donald

Appellant maintains that O'Donald had an agreement with Delaware County prosecutors that he would testify in Appellant's case in exchange for a reduced prison sentence, and that the prosecution failed to correct O'Donald's false testimony at trial that there was no such agreement. In support of his claims, Appellant notes that O'Donald

testified at the PCRA hearing that prosecutors in Appellant's case told him that federal prosecutors would file a Fed.R.Crim.P. 35 motion for a reduction in his federal sentence after he testified in Appellant's case; that O'Donald cooperated in Appellant's case in order to receive a sentence reduction; and that O'Donald's federal prison sentence was, in fact, reduced from 17 to 14 years shortly after Appellant's trial had concluded. Appellant also points to a document from the District Attorney's office entitled "Points to Cover Re: Prison Informant,"[13] which was discussed during a July 2, 1997 meeting between O'Donald and local prosecutors concerning his cooperation in Appellant's case, and which stated, in pertinent part:

> 6. Do you understand that I am the First Assistant District Attorney of Delaware County and therefore not a member of the United States Attorney's Office?
>
> 7. Do you understand that since I am not a member of the [U]nited States Attorney's Office that I have no authority or capacity to appear in court to make a recommendation to the court which shall sentence you?
>
> 8. Do you understand that I will have the ability to provide information to the [U]nited States Attorney's Office and to any other relevant party as to my opinion of the sincerity and candor of your cooperation?
>
> 9. Do you understand that any benefit that you may receive for your cooperation is <u>not</u> dependent on any information you may or may not provide, but will flow solely from your sincere and candid cooperation in terms of your willingness to serve as a "listening post" for Bowmar [sic].

Appellant's Brief at 14 (quoting PCRA Exhibit 79) (emphasis original). Appellant claims this document unequivocally established that O'Donald reached a bargain with Delaware

---

[13] The Commonwealth stipulated that this document was contained in the District Attorney's file. <u>See</u> N.T., 1/15/09, at 10.

County prosecutors regarding his cooperation in Appellant's case, which he alleges came to fruition on October 15, 1998, when federal prosecutors filed a Motion for Reduction of Sentence for Changed Circumstances Pursuant to Fed.R.Crim.P. 35(b), and, according to Appellant, was based "solely" on his cooperation in Appellant's case. Appellant's Brief at 16.

Preliminarily, we note that Appellant's alleged <u>Brady</u> evidence would appear to have been available at the time of Appellant's trial, post-sentence motions, or his direct appeal, as Appellant's counsel had in his possession O'Donald's plea agreement with federal prosecutors at the time of trial; the Motion for Reduction of Sentence in O'Donald's case was filed two weeks after the conclusion of the guilt phase of Appellant's trial; and O'Donald received a reduced sentence days later. While Appellant maintains he raised his <u>Brady</u> claim at his first opportunity to do so, he fails to indicate when he became aware of the alleged <u>Brady</u> violation and fails to explain why, with reasonable diligence, he could not have uncovered evidence of the alleged violation at an earlier time. Accordingly, because Appellant failed to raise this issue in an earlier proceeding, the claim appears to have been waived. <u>See</u> <u>Commonwealth v. Roney</u>, 79 A.3d 595, 609 (Pa. 2013) (finding <u>Brady</u> claim to be waived when the appellant failed to raise the issue at trial or on direct appeal and failed to argue why his prior counsel could not have uncovered the alleged <u>Brady</u> violations with reasonable diligence). However, the Commonwealth does not assert waiver; thus, we will consider the claim on the merits.

The PCRA court concluded that no agreement existed between the Commonwealth and O'Donald, and, thus, that the Commonwealth did not violate <u>Brady</u> for failing to disclose it, noting that, although O'Donald testified during the PCRA hearing regarding the existence of an agreement, his testimony lacked credibility. PCRA Court Opinion, 9/4/12, at 49-51, 55. Specifically, the PCRA court pointed out that O'Donald

entered a plea agreement with federal prosecutors in February 1997 — prior to his cooperation in Appellant's case — in which he agreed to provide investigators with information concerning 12 unsolved bank robberies. In exchange for his guilty plea, prosecutors agreed to inform the sentencing court of his cooperation in the other cases and to encourage the court, at its discretion, to impose a sentence below the applicable mandatory minimum. The PCRA court opined that O'Donald initiated discussions with authorities in Appellant's case because he hoped that cooperating with local authorities in that investigation would result in an additional sentence reduction pursuant to his earlier plea agreement. However, the court noted that, during O'Donald's July 2, 1997 meeting with local prosecutors concerning his cooperation in this matter, prosecutors informed O'Donald that they were not affiliated with the United States Attorneys' Office and expressly stated they lacked authority to make formal recommendations regarding his federal sentence. See PCRA Exhibit 79. While prosecutors informed O'Donald during the meeting that they could potentially advise the United States Attorneys' Office of his cooperation in the matter, and although the federal district court judge ultimately considered O'Donald's cooperation in Appellant's case in conjunction with his cooperation in the bank robbery cases when it granted the motion to reduce O'Donald's sentence, the PCRA court found that "no prosecutor, local or federal, promised O'Donald that a motion seeking a further reduction would be filed on his behalf if he testified at trial," PCRA Court Opinion, 9/4/12, at 49, and that O'Donald's "subjective belief does not support the conclusion that promises of this nature were made." Id. at 51.

The PCRA court further determined that, even assuming *arguendo* that such an agreement existed, its alleged concealment did not impact the verdict, as O'Donald's credibility was challenged extensively during cross-examination; the trial court issued a cautionary instruction to the jury regarding its consideration of O'Donald's testimony; and

substantial other physical and circumstantial evidence of Appellant's guilt independent of O'Donald's testimony was offered at trial.

As the PCRA court highlighted in its opinion, the "Points to Cover Re: Prison Informant" document reflects that prosecutors specifically told O'Donald that they lacked authority to make a recommendation on O'Donald's behalf at sentencing, and that any benefit O'Donald might receive from sentencing was not dependent on any information he provided to them. PCRA Exhibit 79. Additionally, the federal prosecutor noted during O'Donald's resentencing hearing that "there were no deals between [O'Donald and] . . . the D.A.'s office in Delaware County," N.T., 1/7/1999, at 21-22, and the Assistant District Attorney similarly expressed during Appellant's PCRA hearing that prosecutors "weren't offering [O'Donald] any consideration." N.T., 1/15/2009, at 131.

While, as the PCRA court found, one could construe the above as evidencing that there was no agreement between O'Donald and prosecutors for a reduced sentence, other evidence strongly suggests the existence of such an agreement. Indeed, although the "Points to Cover" document stated that prosecutors lacked the authority to make a sentencing recommendation on O'Donald's behalf, the document also discussed the prosecutor's ability to provide information to the United States Attorney's Office regarding O'Donald's cooperation, noted that any potential benefit to O'Donald would flow from his willingness to serve as a listening post, and characterized O'Donald's relationship with prosecutors as an "understanding." PCRA Exhibit 79. Further, at O'Donald's resentencing hearing, the federal prosecutor confirmed that O'Donald had a "deal . . . with the federal government to cooperate in any and all investigations as . . . requested of [O'Donald]," N.T., 1/7/1999, at 22, and the Assistant District Attorney testified at Appellant's PCRA hearing that, following O'Donald's cooperation in Appellant's case, he "fully expected [O'Donald] to . . . return to Federal Court and ask the Judge to reduce his

sentence from the 17 years." N.T., 1/15/2009, at 139. Indeed, as noted above, shortly after Appellant's trial had concluded, federal prosecutors filed a Fed.R.Crim.P. 35(b) Motion for Reduction of Sentence, and O'Donald's prison sentence was reduced from 17 to 14 years.

Nevertheless, we need not reach a definitive conclusion as to whether or not an agreement existed between O'Donald and prosecutors because, even if such an agreement did exist, any Brady violation in this regard did not prejudice Appellant in light of the extensive DNA and circumstantial evidence against him, including, *inter alia*, sperm recovered from the victim's vagina which matched Appellant's DNA profile; DNA from the victim found on the right door panel of Appellant's vehicle; tire patterns at the murder scene which matched tire patterns from Appellant's vehicle; and testimony from Appellant's ex-girlfriend revealing that Appellant confessed to raping and murdering the victim, and described specific details surrounding the incident. Moreover, O'Donald admitted during direct examination that he had a plea agreement with federal prosecutors, that his cooperation in Appellant's case was brought to the federal judge's attention during his October 1997 sentencing hearing, that he was dissatisfied with his current sentence, and that a motion for further reduction of his sentence was pending, N.T., 9/28/98, at 273, 285-87, prompting the trial court to instruct the jury to consider O'Donald's testimony with caution because O'Donald "believed the level of his cooperation with law enforcement authorities in this case would have a positive impact on the sentence he would receive in federal court." PCRA Opinion, 9/4/12, at 44 (quoting N.T., 9/30/98, at 160). Thus, in light of the substantial evidence against Appellant and the fact that the trial court highlighted possible bias in O'Donald's testimony and directed the jury to view the testimony with caution, we find that it is not probable that the result of

Appellant's trial would have been different if the alleged <u>Brady</u> material had been disclosed to him.

*2. Quincy Jamal Williams*

Appellant similarly argues that an agreement existed between prosecutors and Williams, claiming Williams was facing first-degree murder charges, but was permitted to plead guilty to voluntary manslaughter in exchange for his testimony in Appellant's case. As proof of this alleged agreement, Appellant references Williams' testimony from the PCRA hearing stating that he testified in Appellant's case because the prosecutor promised him that he would be released on parole, and that his testimony was false and based on information fed to him by the prosecutor and detectives. Appellant also refers to a letter First Assistant District Attorney ("ADA") Daniel J. McDevitt wrote to the Pennsylvania Board of Probation and Parole two years after Appellant's trial acknowledging Williams' cooperation in the case and a letter Williams wrote to ADA McDevitt in 2003 inquiring into their "deal" regarding his parole.

In addressing Appellant's <u>Brady</u> claim, the PCRA court concluded that no credible evidence established that prosecutors promised Williams parole in exchange for his testimony in Appellant's case. PCRA Court Opinion, 9/4/12, at 58. Specifically, the PCRA court observed that, while Williams testified during the PCRA hearing regarding an alleged agreement he had with prosecutors in exchange for his testimony, credible evidence proved otherwise, as ADA McDevitt testified during the PCRA hearing that Williams' cooperation in Appellant's case had no influence on his office's decision to allow Williams to plead guilty to involuntary manslaughter, and that prosecutors made no specific sentencing recommendations and did not ask for leniency on Williams' behalf. The PCRA court further noted that ADA McDevitt explicitly stated in a 2003 letter to

Williams that no deal existed between them, and that, although ADA McDevitt did, in fact, write a letter to the Pennsylvania Board of Probation and Parole advising the Board of Williams' cooperation in Appellant's case, he did so at the request of Williams' mother, and the letter did not represent that an agreement existed between Williams and law enforcement. Based on the foregoing, the PCRA court concluded that, "[w]hile Williams may have harbored the subjective hope that at some point his testimony would garner a benefit, there is no credible evidence supporting the conclusion that Mr. McDevitt, or anyone in law reinforcement [sic], promised him parole upon the service of his minimum sentence." Id. at 59 (footnote omitted).

We agree. While Appellant bases his claim on Williams' testimony, the PCRA court specifically found the testimony was incredible. Appellant's reliance on his earlier plea agreement and ADA McDevitt's letter to the Parole Board is similarly unavailing. Indeed, Williams entered his open guilty plea and was sentenced in July 1998, months before Appellant's trial began, and ADA McDevitt's parole letter makes no reference to an agreement with Williams and, in fact, states that Williams' cooperation with law enforcement was entirely voluntary. Further, although, as noted above, Williams referenced a deal in his letter to ADA McDevitt, ADA McDevitt's letter in response explicitly rejected the existence of an agreement between Williams and the Commonwealth. Accordingly, because Appellant has failed to establish with credible evidence that an agreement existed between Williams and the Commonwealth, his claim fails.

*3. PCRA Court Error*

Appellant additionally argues that, in rejecting his claims, the PCRA court misapplied the materiality standard for relief pursuant to Brady and Napue, improperly

assessing materiality in terms of whether "after discounting items of evidence tainted by non-disclosure, the remaining evidence is sufficient to support a verdict of guilt," rather than evaluating whether a reasonable likelihood exists that the non-disclosure would have affected the judgment of the jury, as he contends is required by Napue. Appellant's Brief at 23. According to Appellant, if the PCRA court had properly applied the materiality standard, it would have found the non-disclosure of the agreements between the prosecution and the Commonwealth witnesses and the motivation for the witnesses' testimony affected the judgment of the jury, as, according to Appellant, the testimony was damaging in nature and the jury would not have believed it if it knew the witnesses were testifying pursuant to agreements for reduced sentences.

Appellant's argument is largely beside the point. The PCRA court rejected Appellant's Brady claims based upon its finding that no agreements existed between the Commonwealth and its witnesses, and, thus, that the Commonwealth did not conceal any evidence. Moreover, as we discussed in detail above, even if an agreement existed between prosecutors and O'Donald, its nondisclosure did not affect the judgment of the jury in light of the wealth of significant other evidence implicating Appellant in the murder. Appellant is, thus, not entitled to relief on this claim.

## B.  Competency

Appellant next argues that his due process rights were violated because he was incompetent at the time of his trial and, therefore, unable to rationally assist counsel. Initially, we note that Appellant did not challenge his competency to stand trial on direct appeal. While an Appellant's failure to raise a claim on direct appeal generally results in waiver of that claim under the PCRA, "[a] failure to raise on direct appeal a claim that the appellant was incompetent at the time of trial does not constitute a waiver of that claim for

purposes of the PCRA." Commonwealth v. Brown, 872 A.2d 1139, 1153 (Pa. 2005) (plurality);[14] see also Commonwealth v. Spotz, 18 A.3d 244, 262 n.10 (Pa. 2011) (reaffirming Brown holding that competency is an exception to the waiver rule under the PCRA). Accordingly, we will proceed to entertain Appellant's claim.

In January 1998, prior to Appellant's preliminary hearing, Appellant's trial counsel petitioned the court to appoint a psychiatrist to determine his competency, noting that Appellant had twice attempted suicide during his pre-trial incarceration, that counsel's communication with Appellant had "broken down," and that Appellant had recently accused him of being a district attorney and raping his wife. The trial court appointed Dr. Robert Sadoff to conduct a competency evaluation, which occurred on January 10, 1998. At the time of the evaluation, Dr. Sadoff was not provided with Appellant's prison records; however, counsel advised him of Appellant's suicide attempts, Appellant's accusations against him, and his disruptive behavior in prison. Ultimately, Dr. Sadoff found that Appellant exhibited symptoms of a paranoid personality disorder, but concluded that Appellant was nevertheless competent to stand trial, as his personality disorder did not impact his ability to understand the nature of the proceedings against him or to participate in his defense. The trial court conducted a competency hearing on January 16, 1998,[15]

---

[14] While Brown was a plurality opinion, Justice Nigro stated in his concurring and dissenting opinion that he "note[d] [his] specific agreement with the majority's treatment of [the] [a]ppellant's claim that he was not competent to stand trial, including its holding that a post-conviction petitioner's failure to raise a claim on direct appeal that he was incompetent at the time of trial does not constitute a waiver of that claim for purposes of the PCRA." Brown, 872 A.2d at 1170 (Nigro, J., concurring and dissenting). As a result, a majority of this Court held that competency to stand trial is an exception to the waiver rule under the PCRA.

[15] In his brief, Appellant claims there was "no actual competency hearing." Appellant's Brief at 27. The PCRA court explicitly rejected this assertion in its opinion, and, based upon the record, we agree with the PCRA court that a competency hearing was, indeed, conducted. See PCRA Court Opinion, 9/4/12, at 25.

during which Appellant's trial counsel stated that he did not object to Dr. Sadoff's conclusions and that he did not wish to obtain his own expert. The court, based upon Dr. Sadoff's findings, concluded Appellant was competent to stand trial.

Appellant's PCRA counsel later retained Dr. Richard Dudley to examine and evaluate Appellant's competency in 2004 and 2006. Dr. Dudley testified at Appellant's PCRA hearing that Appellant suffered from an anti-social personality disorder and borderline personality disorder, and opined that the disorders had rendered him incompetent to stand trial.[16] The Commonwealth countered Dr. Dudley's testimony at the PCRA hearing with testimony from Dr. Sadoff, as well as testimony from Dr. Gerald Cooke, who examined Appellant in April 1998 and September 1998, both of whom opined that Appellant was competent at the time of trial.[17] Based upon the foregoing, the PCRA court rejected Dr. Dudley's testimony in favor of the Commonwealth's experts, and concluded Appellant was indeed competent to stand trial. PCRA Court Opinion, 9/4/12, at 31-32.

Presently, Appellant argues that, because Dr. Sadoff's competency evaluation took place in January 1998, over eight months before trial began, the evaluation did not accurately reflect Appellant's competency at the time of his trial, as, according to Appellant, his mental condition deteriorated shortly after the evaluation had been completed. Specifically, Appellant references prison records from January 1998 through

---

[16] Dr. Dudley further opined that Appellant was incompetent at the time of the PCRA hearings; however, the issue of Appellant's competence at the PCRA hearings is not presently before this Court.

[17] The Commonwealth also presented testimony from psychologist Edward Dougherty, who examined Appellant in August 1998 in anticipation of the penalty phase of Appellant's trial, but was unable to complete his evaluation because Appellant had been unwilling to complete psychological testing and unwilling to provide information about his background. As a result, Dr. Dougherty would not opine as to Appellant's competency to stand trial.

August 1998, which he claims reflect that he was delusional, rambled incoherently, and was "suffering from psychosis and uncontrollable rages." Appellant's Brief at 25. Appellant notes that Dr. Sadoff did not receive these prison records prior to his evaluation, and suggests that, if Dr. Sadoff had received them, he would have found Appellant incompetent. Rather than crediting the testimony of Dr. Sadoff, Appellant maintains that the PCRA court should have credited the testimony of Dr. Dudley, who, upon examination of Appellant after trial, found that "Appellant was undergoing psychotic breaks during his pre-trial incarceration and that, as a result, he was unable to rationally assist counsel and was incompetent." Appellant's Brief at 27.

In response, the Commonwealth points out that Appellant's allegations of incompetency are based primarily on a psychiatric examination that was performed six years after his trial. Citing to our decision in Brown, supra, wherein we concluded that a competency assessment from eight years after trial does not establish incompetency at the time of trial, the Commonwealth maintains that this Court rejects such "after-the-fact" competency claims. The Commonwealth further observes that the PCRA court's factual findings and credibility determinations are supported by the record, and, thus, argues they should not be disturbed on appeal.

A defendant is presumed to be competent to stand trial and bears the burden of proving otherwise. Commonwealth v. Smith, 17 A.3d 873, 899 (Pa. 2011). To establish that he was incompetent, Appellant must prove, by a preponderance of the evidence, "that he was either unable to understand the nature of the proceedings against him or to participate in his own defense." Rainey, 928 A.2d at 236. Here, Appellant has failed to meet this burden. In arguing he was incompetent to stand trial, Appellant relies primarily upon Dr. Dudley's competency evaluations which took place six years after Appellant's trial. As the Commonwealth observes, however, a defendant's competency to stand trial

must be evaluated at the time of trial.   Commonwealth v. Bracey, 795 A.2d 935, 945-46. (Pa. 2001) (rejecting competency evaluation from five years after trial).   In providing Dr. Dudley's hindsight assessment of Appellant's competency to stand trial, Appellant plainly overlooks this requirement.   See id.; Brown, 872 A.2d at 1156 (rejecting competency assessment from eight years after trial).

To the extent Appellant argues that Dr. Sadoff's competency evaluation from eight months before trial similarly failed to establish Appellant's competency at the time of trial, and to the extent that he asserts the evaluation was inadequate because his prison records were not made available to Dr. Sadoff, we note that Appellant failed to object to Dr. Sadoff's evaluation and testimony at the pre-trial competency hearing and, thus, he has waived these arguments.[18]   See Pa.R.A.P. 302(a).   Moreover, as noted above, the burden is on Appellant to establish his incompetency, rather than on the Commonwealth to establish Appellant's competency.   See Smith, 17 A.3d at 899.   In any event, as the PCRA court observed below, additional competency evaluations were conducted in April 1998 and September 1998, closer in proximity to Appellant's trial, which confirmed Appellant's competence, and Dr. Sadoff testified during the PCRA hearing that he was informed of the events contained in the prison records prior to conducting his examination of Appellant, and that they did not impact his conclusion.   Accordingly, we decline to find that the PCRA court erred in rejecting Appellant's incompetency claim.

### C.   Denial of Effective Counsel at Penalty Phase

Appellant next contends that penalty phase counsel was ineffective for failing to "properly present and explain the significance of Appellant's traumatic childhood,

---

[18] Appellant concedes counsel's failure to object, but nonetheless raises no claim of ineffectiveness herein.

dysfunction, and serious mental illness" to the jury, arguing that, although penalty phase counsel presented some mitigating evidence to the jury, she failed to explain the significance of that evidence and how it affected Appellant, and failed to present additional mitigating evidence that was available regarding his troubled upbringing and mental health. Appellant's Brief at 41. Appellant further avers that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness on direct appeal.

Initially, we note that Appellant failed to raise this claim of trial counsel ineffectiveness in post-sentence motions or on direct appeal; thus, it is waived. See Bomar I, 826 A.2d at 853-54; Hubbard, 372 A.2d at 697 n.9. Nevertheless, as Appellant also alleges ineffectiveness of appellate counsel, we will proceed to evaluate his layered ineffectiveness claim.

During the penalty phase of Appellant's trial, Appellant's counsel presented mitigating testimony from several of his acquaintances, who testified generally regarding his good character, as well as testimony from Appellant's younger brother, William "Sonny" Ganges, his mother, Carrie Ganges, and his half-sister, Joyce Batchelor. While Sonny and Carrie Ganges gave only brief statements expressing their disagreement with the guilty verdict, Batchelor testified extensively regarding Appellant's troubled upbringing. Specifically, Batchelor described that their childhood was "hell," marked by "constant violence all the time" between their mother and Appellant's father, Arthur Sr., claiming they fought every day. N.T., 10/5/98, at 108. Batchelor recounted that, during several fights between Appellant's parents, their mother chopped up all the furniture in the house with an ax, and, on one occasion, poured gasoline inside the house and set it on fire. Id. at 109-10. Batchelor testified that Arthur Sr. was "a very cruel person," who drank every day and failed to exhibit any kind of parenting toward the children; that their mother was "a crazy person"; and that she did not remember her mother ever holding

Appellant as a child.  Id. at 110, 117.  Batchelor testified that Appellant lived with his mother until he was eight or nine years-old, and lived with his father until he was a teenager.

Penalty phase counsel also elicited testimony from Dr. Gerald Cooke, Appellant's mental health expert.  Dr. Cooke described that, as a child, Appellant had been classified as Educably Mentally Retarded ("EMR"), was placed in special education for seven or eight years, and, later, was significantly behind in achievement levels in high school.  Id. at 47.  According to Dr. Cooke, Appellant's I.Q. was 80, which is in the bottom of the low average range.  Id. at 50.  Dr. Cooke opined that his testing of Appellant suggested that Appellant suffered from organic brain damage; however, he noted that he was unable to reach a firm conclusion because Appellant frequently exhibited problems with attention and motivation during testing and only completed four out of seven tests necessary to reach a firm diagnosis, refusing to complete the rest because he grew frustrated.  Id. at 48-50, 58.  Dr. Cooke further opined during the penalty hearing that Appellant suffered from borderline and anti-social personality disorders, causing him to have "confusion when it comes to love, sex, and aggression," and "very poor emotional control," "lead[ing] him to engage in some of the kind of behaviors that are reflected in his past history."  Id. at 53.

Notwithstanding the foregoing, Appellant now claims penalty phase counsel should have presented additional testimony from others close to him concerning his troubled upbringing and his resulting displays of "bizarre behavior, emotional instability, learning problems, and dissociative experiences."  Appellant's Brief at 32.  Appellant also maintains that penalty phase counsel should have hired a mitigation specialist, who he suggests would have built a rapport with his family members, enabling her to complete a social history of Appellant for counsel to present to the jury, and should have elicited

testimony from Dr. Cooke regarding the relationship between Appellant's troubled childhood and psychological issues, as well as showing the effect his personality disorders had on his everyday life. In support of this claim, Appellant's PCRA counsel introduced affidavits at the PCRA hearing from various family members and acquaintances, including, *inter alia*, Batchelor, Lorraine Cotton, Bettie McCullen, and Anna Sherman Wilson, which provided a more detailed description of the abuse and neglect that Appellant experienced throughout his childhood. PCRA counsel also provided an affidavit from Dr. Dudley, who conducted a psychiatric analysis of Appellant in 2004, as well as testimony from Marissa Browne, a licensed professional counselor who performed a drug and alcohol evaluation of Appellant in 1990 as a condition of his parole; and Dr. Dougherty, who had been retained by penalty phase counsel in 1998 to conduct a neuropsychological examination of Appellant.

Batchelor stated in her affidavit, *inter alia*, that Appellant's parents drank heavily, and that "[t]here would always be a bottle of liquor on the table." Declaration and Affidavit of Joyce Batchelor, at 879. Batchelor also detailed various fights that occurred between Appellant's parents, describing that "physical, knockdown fights" took place at their home every day, including times where Appellant's mother shot, stabbed, and burned Arthur Sr., and times when she set fires with gasoline and broke windows in the house. Id. Additionally, Batchelor described an incident wherein Appellant was arrested in Reno, Nevada and was later gang-raped and beaten at the jail facility. Id. at 882. While Batchelor acknowledged in her affidavit that she did not testify regarding this additional information during Appellant's penalty hearing, she claimed she provided it to Appellant's penalty phase counsel when she met with her before trial, and stated that she would have shared the information during trial had she been asked about it.

Lorraine Cotton, Appellant's half-sister, stated in her affidavit that Appellant began to develop behavioral problems as early as kindergarten, noting that Appellant stabbed a classmate in the eye with a pencil and that the school made repeated recommendations to Appellant's mother that Appellant receive help. According to Cotton, Appellant's mother ignored the school's recommendations, denying that Appellant had behavioral issues or that he needed special education. Cotton also described that Appellant's mother traveled between relationships in Pennsylvania and Nevada, leaving Appellant and his brother alone in Reno for months at a time while they were teenagers, and opined that the lack of guidance and structure in Appellant's life caused him to continue to get into trouble. Cotton noted that she was never contacted by Appellant's counsel to testify, but stated that she would have testified regarding the aforementioned details had she been asked to do so.

Bettie McCullen, another of Appellant's half-sisters, stated in her affidavit that their mother never showed her children affection, and that, at times, she "was gone from [their] childhood completely," sometimes for years at a time. Declaration and Affidavit of Bettie McCullen, at 892. McCullen also described that their mother was mentally ill and would often carry on loud conversations with herself. With respect to Appellant, McCullen stated that Appellant was the only child she thought had a true bond with their mother, and that she thought that he and their mother were both crazy. McCullen also described that Appellant "was shuffled around a lot" as a child, and that her father took him in for a period after he got into trouble in Nevada and their mother was "nowhere to be found." Id. at 896. Attached to McCullen's affidavit was a letter to their mother from their aunt, notifying her that doctors and psychologists expressed concerns that Appellant might suffer from psychological problems possibly attributable to birth or early childhood. McCullen also attached one of Appellant's report cards, which included comments from

the teacher regarding Appellant's poor work habits.   McCullen stated that she was never contacted to testify at Appellant's trial, but would have been willing to do so had she been subpoenaed.

Anna Sherman Wilson, Appellant's aunt, recounted in her affidavit that she remembered Appellant's mother going to a local tavern while she was pregnant with Appellant, where she got into a fight with another woman.   Wilson expressed that she "often wondered later if [Appellant's] problems were because of [his mother's] fighting and drinking while she was pregnant with him."   Declaration and Affidavit of Anna Sherman Wilson, at 910.   Wilson explained that Appellant's mother never gave her children love or affection, and that she neglected Appellant while he was a toddler.   She also noted that Appellant's mother and father fought often, describing that, on one occasion, Appellant's mother destroyed their furniture, gutted a mattress, and set it and the apartment on fire while the children were present, and, another time, threw kerosene on Appellant's father, lit a newspaper, and chased him around, trying to set him on fire.

Wilson detailed that she and her sisters tried to help raise her sister's children and that, when Appellant arrived at her home she "knew he had serious problems." Declaration and Affidavit of Anna Sherman Wilson, at 912.   Specifically, Wilson noted that Appellant would often stare into space, had trouble remembering things, and frequently acted out in school.   Wilson stated that Appellant was later diagnosed with learning disabilities, transferred into a special education program at another school, and was later transferred to a third school with a more structured special education program because of his continued behavioral problems.   According to Wilson, while Appellant was at the third school, he was sent home because he threatened a classmate with a knife.   Wilson also related that, when he was in eighth grade, Appellant was sent to live

with his father, who later killed Appellant's pet pigeon because Appellant refused to have sex with prostitutes that his father hired for him.

With respect to Appellant's behavioral and psychological problems, Wilson described that Appellant's mother never disciplined Appellant, disputed his special education label, and resisted any efforts for him to receive professional help. Wilson noted that Appellant's brother Charles told her that Appellant was crazy and needed help, but that Appellant and his mother both threatened to kill Charles in response to the allegations. Wilson claimed that no one contacted her to testify at Appellant's trial, but stated that she would have been willing to testify had she been asked to do so.

Kathleen Kaib, a mitigation specialist employed by the Federal Community Defender, testified during the PCRA hearing regarding a social history she performed on Appellant prior to the PCRA hearing. Specifically, Kaib testified that, while researching Appellant's social history, she discovered that Appellant witnessed severe domestic violence between his parents, and suffered abandonment — both emotional and physical — from his mother, father, stepfathers, and siblings. Kaib described that Appellant lived with his mother and father in Milwaukee, Wisconsin for several years until his parents broke up, and, thereafter, lived periodically with an aunt in Reno, Nevada; with his grandmother in Philadelphia; with his mother in Reno and Philadelphia; with his father in Wisconsin; and by himself in Reno at the age of 13. Kaib observed that Appellant was never in the same school for two years consecutively and, as a result, problems reported in his school records such as psychological and behavioral problems were never addressed. Kaib also testified that Appellant's mother drank excessively while she was pregnant with Appellant, that both of Appellant's parents were alcoholics, and that Appellant's father required him to have sex with prostitutes when he was approximately 11 or 12 years old. Additionally, Kaib noted that one of Appellant's sisters physically

abused him as a child, that Appellant's father shook coins in his ear when he was a baby, and that Appellant had been raped in a juvenile facility when he was 13 or 14 years old.

PCRA counsel also introduced testimony from Dr. Dougherty concerning Appellant's mental health. Dr. Dougherty described that he initially gave counsel a preliminary diagnosis of intermittent explosive disorder prior to Appellant's trial, but told counsel that he would need to see Appellant for a longer period of time and that he "would have to get every record [he] could get [his] hands on to understand his background and development to see if [he] could confirm that diagnosis or not." N.T., 4/28/09, at 151. According to Dr. Dougherty, Appellant refused to undergo further psychological testing and, thus, Dr. Dougherty was unable to complete his evaluation.

Dr. Dougherty testified that he had not received Appellant's Delaware County Jail Records at the time of his initial evaluation, but that, upon reviewing them in 2008, he found that the administration of strong psychotropic medications to Appellant in prison and his acting out and suicide attempts in prison were significant and something that he would have wished to explore further. Dr. Dougherty also found significant several details regarding Appellant's upbringing of which he was not previously apprised, including that Appellant's mother ingested alcohol consistently throughout her pregnancy, possibly leading to fetal alcohol syndrome; that Appellant had psychological and behavioral problems as a child and switched schools frequently; that Appellant's mother was abusive and erratic; that Appellant's parents engaged in continued and escalating domestic violence; and that Appellant was abandoned by his mother. Based upon this information, Dr. Dougherty opined that he would have diagnosed Appellant with an anti-social personality disorder and borderline personality disorder.

Marissa Browne testified that, in accordance with a condition of Appellant's parole for a prior conviction, she met with Appellant on four occasions in 1990 to evaluate him for

possible drug and alcohol abuse. During this time, Browne observed that Appellant was not forthcoming about his family history and noted that Appellant "[had] some issues with women" and "seemed rather paranoid." N.T., 11/7/08, at 38. Browne explained that she ultimately diagnosed Appellant with "paranoid personality disorder, alcohol and cannabis abuse and remission," and recommended that Appellant undergo psychological testing and drug and alcohol treatment; however, Appellant never went through with such treatment. Id. at 49-50.

Additionally, PCRA counsel presented an affidavit from Dr. Dudley, who conducted a psychiatric evaluation of Appellant in 2004. Therein, Dr. Dudley opined that, based upon Appellant's behavior and traumatic life history, Appellant suffers from borderline and paranoid personality disorders. Dr. Dudley further opined that Appellant's "extremely savage childhood and adolescence," including "repeated loss . . . repeated victimization by caregivers . . . his exposure to repeated extreme violence, and the absence of parental nurturance, support and direction during critical phases of his development," "constitute significant mitigating evidence that should have been considered by the jury at the penalty phase of his trial." Declaration/Affidavit of Richard Dudley, Jr., at 868. Additionally, to the extent that others have evaluated Appellant, Dr. Dudley suggests that their evaluations were "flawed and unreliable for purposes of assessing the existence of mental health mitigating evidence" because the evaluators were not privy to Appellant's life history and had not completed neuropsychological testing or neuroimaging. Id. at 869-70.

Appellant contends that, given the abundance of highly compelling evidence that was available to penalty phase counsel, her failure to present and explain the foregoing evidence was unreasonable, and he claims that, had counsel properly presented and

explained such evidence, "at least one juror would have reached a different conclusion with regard to sentencing." Appellant's Brief at 43.

The Commonwealth argues that, contrary to Appellant's representations, penalty phase counsel made an exhaustive attempt to obtain mitigation evidence regarding Appellant's mental health and upbringing, and disclosed her findings to defense experts; however, counsel's efforts were severely hampered by the lack of cooperation from Appellant and his family in her investigation. Specifically, the Commonwealth notes that Appellant refused to cooperate with defense mental health experts, preventing them from completing mental health testing and giving them an incomplete record of Appellant's mental health; that Appellant refused to discuss with counsel the identity and location of family members, as well as details regarding his troubled upbringing, prior drug use, and any possible mental health issues that he had; and that Appellant's family failed to return counsel's phone calls and messages, and were evasive regarding Appellant's family history and the addresses and phone numbers of other family members.

The PCRA court, in rejecting Appellant's claim, concluded that penalty counsel's mitigating evidence investigation was reasonable in light of Appellant's lack of cooperation. PCRA Court Opinion, 9/4/12, at 133. In so holding, the PCRA court opined that "[t]his is not a case where [Appellant] elected not to offer mitigation evidence and counsel simply acquiesced [in] [Appellant's] expressed choice and failed to investigate. Nor did counsel merely accept [Appellant's] assertion that his childhood was 'normal' and investigate no further." Id. at 99. Rather, the PCRA court observed that penalty phase counsel continued to investigate — despite the fact that Appellant and his family failed to reveal facts to counsel concerning the violence and neglect that plagued Appellant's childhood and the fact that Appellant failed to participate in mental health evaluations and testing — collecting Appellant's prison, employment, and school records,

personally speaking with members of Appellant's family on multiple occasions, hiring investigators, and attempting to convince Appellant to submit to mental testing numerous times, all to little or no avail.

Pursuant to the Sixth Amendment of the United States Constitution, capital counsel is obligated "to conduct a reasonably thorough investigation for mitigating evidence or to make reasonable decisions that make further investigation unnecessary." Commonwealth v. Lesko, 15 A.3d 345, 380 (Pa. 2011). In determining whether counsel was constitutionally deficient in investigating and presenting mitigation evidence, "we consider a number of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the additional or different mitigation evidence that could have been presented." Id. We note that "[n]one of these factors is, by itself, dispositive, because even if the investigation conducted by counsel was unreasonable, this fact alone will not result in relief if the defendant cannot demonstrate that he was prejudiced by counsel's conduct." Id.

We agree with the PCRA court's conclusion that penalty phase counsel was not ineffective in her investigation and presentation of mitigation evidence. While Appellant suggests that penalty phase counsel should have presented additional testimony regarding his childhood from other witnesses and should have elicited testimony from Dr. Cooke regarding the effect his childhood had on his mental health, Appellant ignores that he and his family directly contributed to counsel's inability to discover and present such information. Indeed, during the PCRA hearing, penalty phase counsel testified that Appellant would not provide her with background information about his childhood, describing that Appellant "was not interested in presenting a mitigation case at all," and that "he didn't want to participate in assisting [her]. N.T., 11/6/08, at 51-53. Appellant similarly refused to cooperate fully with Dr. Cooke, failing to complete all of the

psychological examinations necessary for Dr. Cooke to conduct a full psychological evaluation, N.T., 10/5/98, at 13, and refusing to provide him with information concerning his childhood.  N.T., 11/6/08, at 178-80.

Appellant's relatives were similarly evasive when penalty phase counsel attempted to speak with them.  Several of Appellant's family members declined to speak with investigators; Appellant's mother refused to provide information concerning Appellant's childhood and told counsel that Appellant's relatives "don't want to talk to [her]"; and Appellant's cousin, Mabel Sherman, falsely represented to counsel that Appellant's family was "well adjusted" and had "no problems."  Id. at 78-83. Additionally, Appellant's guilt phase counsel, Mark Much, Esq., testified that he was aware that Appellant's mother was instructing family members not to cooperate in the investigation, and stated that, when he spoke with Appellant about the matter, Appellant told him that he directed his "people" not to discuss his childhood with anyone, further evidencing Appellant's intent to hinder counsel's investigation.  N.T., 11/5/08, at 156-57.

It is well settled that the reasonableness of counsel's investigation and preparation of mitigating evidence is largely dependent upon the information supplied by the defendant; thus, "[c]ounsel cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family which is not provided to counsel."  Commonwealth v. Bond, 819 A.2d 33, 45-46 (Pa. 2002) (holding counsel was not ineffective for failing to present evidence of defendant's traumatic childhood when defendant and his family failed to disclose such information to counsel); see also Commonwealth v. Bracey, 795 A.2d 935, 944 (Pa. 2001) (finding counsel was not ineffective for failing to discover evidence of abuse from family members when defendant and his family did not reveal such evidence to counsel).  Accordingly, under the circumstances of the case sub judice, where Appellant's counsel attempted to conduct a

thorough investigation into potential mitigating evidence over the course of several months, hired investigators to assist her with this task, and, ultimately, presented mitigating testimony during the penalty phase from several of Appellant's acquaintances and family members — all with little to no cooperation from Appellant throughout the entirety of counsel's investigation and the course of the trial — we decline to find that penalty phase counsel's failure to uncover additional mitigating evidence was unreasonable. Likewise, as Appellant refused to discuss his childhood with Dr. Cooke, we decline to find that penalty phase counsel was unreasonable in failing to elicit testimony from Dr. Cooke concerning the significance of Appellant's childhood on his mental health.

However, even if we were to overlook Appellant's complete failure to cooperate in counsel's investigation and accept his position that counsel's investigation was unreasonable and constitutionally deficient, Appellant must still demonstrate that he was prejudiced by counsel's conduct. To establish prejudice, Appellant must prove that "there is a reasonable probability that, but for trial counsel's errors, the result of the proceeding would have been different." Commonwealth v. Koehler, 36 A.3d 121, 150 (Pa. 2012). In other words, "the question is whether there is a reasonable probability that, had the PCRA evidence been adduced at the penalty phase, Appell[ant] would have been able to prove at least one additional mitigating circumstance, and at least one juror would have concluded that the mitigating circumstances collectively outweighed the aggravating ones." Commonwealth v. Gibson, 19 A.3d 512, 526 (Pa. 2011). In evaluating the probability of a different outcome, "we reweigh the evidence in aggravation against the totality of available mitigating evidence, which includes the evidence presented at the penalty hearing and the evidence that would have been presented had counsel conducted a proper investigation." Id.

Here, assuming, *arguendo* that the introduction of additional mitigating evidence concerning Appellant's abusive childhood and mental health would have caused the jury to find the additional "extreme mental or emotional disturbance" mitigator and give more weight to the catchall mitigator that it already found, we cannot say that there is a reasonable probability that any of the jurors would have concluded the mitigating circumstances outweighed or were "as weighty as" the patently grave aggravating circumstances in this case.

Specifically, the Commonwealth proved at trial that Appellant followed his 22-year-old victim, pulled over her vehicle while posing as a police officer, and proceeded to kidnap, rape, and bludgeon the victim to death, supporting the "killing in perpetration of a felony" aggravator on two separate grounds. Additionally, during the penalty phase hearing, the Commonwealth established that Appellant was convicted of second-degree murder in Washoe County, Nevada on June 18, 1979, after shooting and killing a man with a rifle; was convicted of battery with a deadly weapon in Washoe County, Nevada on July 24, 1979, after shooting a woman with a shotgun in her mother's home; and, on March 3, 1986, was convicted of battery by a prisoner after he attacked his female visitor while serving his prison sentences for the aforementioned crimes. N.T., 10/2/98, at 48-51, 55, 61, 65-68. These convictions resulted in the jury additionally finding the significant history of violent felony convictions aggravator, as well as the multiple murders aggravator, which is widely considered to be the "most powerful imaginable aggravating evidence." Commonwealth v. Simpson, 66 A.3d 253, 278 (Pa. 2013) (quoting Wong v. Belmontes, 558 U.S. 15 (2009)).

When viewing prejudice in the context of the entire case, as we must, see Lesko, 15 A.3d at 384 (citing Smith v. Spisak, 558 U.S. 139 (2010)), we find that, in light of the foregoing aggravating circumstances, even if we were to embrace Appellant's additional

mitigating evidence, it is not reasonably probable that this evidence would have caused any of the jurors to alter their vote and return a life sentence. See Lesko, 15 A.3d at 384-85 (in light of the patently grave aggravating circumstances, including the multiple murders aggravator, the appellant was not prejudiced by counsel's failure to present additional mitigating evidence); Gibson, 19 A.3d at 526-31 (finding additional mitigating evidence would not have caused a juror to alter his or her vote where powerful aggravating evidence was offered); Simpson, 66 A.3d at 277-78 (defendant was not prejudiced where significant aggravating evidence was offered and facts supporting the defendant's conviction were grave). Accordingly, because Appellant has not proven that he was prejudiced, and, thus, has not proven that his penalty phase counsel was ineffective in her investigation and presentation of mitigating evidence, we will not deem appellate counsel ineffective for failing to raise this meritless claim on direct appeal. See Commonwealth v. Gwynn, 943 A.2d 940, 949 (Pa. 2008) (holding counsel is not ineffective for failing to pursue meritless claims).

### D. Unreliable Forensic Evidence

Appellant next challenges the manner in which the Commonwealth presented DNA evidence to the jury at his trial and raises a layered ineffectiveness claim with respect to counsel's failure to challenge the Commonwealth's presentation of DNA evidence.

During trial, the Commonwealth's DNA expert, Sarah Gotwald, [19] testified regarding DNA evidence recovered from vaginal swabs taken from the victim's body. Specifically, Gotwald explained to the jury that, from these vaginal swabs, she developed

---

[19] Gotwald now goes by the name Sarah Kucherer. To avoid confusion, we will continue to refer to her as Sarah Gotwald.

a male DNA profile, which she tested using the restriction fragment length polymorphism ("RFLP") method on six different regions, and compared to a DNA sample obtained from Appellant.[20]  N.T., 9/28/98, at 62.  Gotwald described that three of the areas tested yielded no results because of a low presence of DNA, but that the three remaining regions matched the DNA profile obtained from Appellant's DNA sample, noting that the probability of randomly selecting an unrelated individual matching this DNA profile is 1 in 3 million in the Caucasian population; 1 in 2,300,000 in the African American population, and 1 in 2,400,000 in the Hispanic population.[21]  Id. at 62-64.  Relevant to the instant appeal, as Gotwald explained the procedures used to conduct a RFLP analysis, the Commonwealth placed one of the autorads[22] of a sample matching Appellant's DNA sample on an overhead projector along with an autorad of Appellant's actual DNA sample, and Gotwald opined that they visually matched.  Id. at 65-69.  The Commonwealth did not place the other two "matches" on the projector, however.

---

[20] Because the samples that Gotwald received contained low levels of DNA, she initially tested them using the preliminary chain reaction ("PCR") method, N.T,. 9/28/98, at 33, which is designed to "handle forensic samples that are of low quantity and poor quality." John M. Butler, Forensic DNA Typing 30 (2d ed. 2005).  However, Gotwald later determined that she could re-extract the DNA from multiple swabs that had been supplied to her, allowing her to re-test the sample using the RFLP method.  The RFLP method requires a larger sample of DNA than the PCR method and requires the sample to be intact and well-preserved, but its results are more discriminatory than the PCR method, meaning the results are better able to discern the difference between individuals.  Id. at 4-5, 29 (Table 2.1).

[21] The PCR testing in this case reflected that the probability of finding this DNA profile in an unrelated individual is one in 58,300 in the African American population; one in 5,000 in the Caucasian population; and one in 9,100 in the Hispanic population.  N.T., 9/28/98, at 48-49.  Appellant is African American.

[22] An "autorad," short for autoradiogram or autoradiograph, is a piece of X-ray film upon which the pattern of DNA fragments — similar to a supermarket bar code — collected from testing is recorded.  Norah Rudin & Keith Inman, An Introduction to Forensic DNA Analysis 74 (2d ed. 2002).

Rather, on redirect examination, the Commonwealth asked whether testing of the other two "matching" regions of the DNA sample produced "similar results," and Gotwald responded:

> Yes, they were from the same nylon membrane. They were just put in different radioactive probe looking for a different fragment. There were bands from the male fraction of Q-3 which matched the blood labeled as [Appellant's] on those two autorads as well. So there were similar results. You're looking at the same data, but the bands were in different locations because you're looking areas [sic] of the DNA.

Id. at 116.

Appellant's counsel did not challenge the admission of this DNA evidence at trial, nor did he object to the manner in which it was presented. Nevertheless, Appellant presently maintains that the manner in which the Commonwealth presented the DNA evidence to the jury was false and misleading, claiming the jury should not have been asked to accept the Commonwealth expert's opinion that two of the alleged "matching" DNA samples produced results similar to the autorad that was shown on the overhead projector without being given a similar opportunity to observe them. Appellant further asserts that his expert witness, Dr. Paul Goldstein, testified at the PCRA hearing that he disagreed with Gotwald's conclusions that the two samples which were not presented to the jury produced results similar to the match that was presented to the jury, and that he "disagreed that any of the three 'matching' autorads could reliably be called a match to Appellant's profile." Appellant's Brief at 50. Based on the foregoing, Appellant argues that his conviction and death sentence were based upon unreliable forensic evidence, violating his right to due process under the Fourteenth Amendment of the United States Constitution. Appellant additionally asserts that trial counsel was ineffective for failing to adequately cross-examine Gotwald and failing to challenge her testimony that the other

two DNA samples produced similar results to the autorad shown on the overhead projector, and that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness on direct appeal.

The Commonwealth responds that Gotwald's expert testimony was sound, as she presented a step-by-step explanation of the processes used in analyzing the DNA samples and "established proper protocols were followed regarding the ["PSP"] lab's handling of the evidence, its analysis of the DNA evidence, and in making a match declaration." Commonwealth's Brief at 48. Moreover, the Commonwealth notes that, during the PCRA hearing, Lisa Grossweiler, a Cellmark Diagnostics DNA analyst who reviewed the lab work performed in this case and independently tested the DNA evidence, confirmed that the lab properly declared a match between Appellant's DNA and the DNA evidence recovered from the crime scene. The Commonwealth further observes that trial counsel did not challenge Gotwald's conclusions or her methodology in arriving at these conclusions.

At the outset, the PCRA court found that Appellant waived his underlying challenge to the reliability of the forensic evidence presented at trial, as he failed to object to the admission of the evidence at trial or the manner in which the evidence was presented, and he failed to raise the issue on direct appeal. PCRA Court Opinion, 9/4/12, at 61. The PCRA court also concluded Appellant's layered ineffectiveness claims lacked merit. Specifically, the PCRA court noted that, as confirmed by independent DNA analyst Grossweiler, Gotwald followed generally accepted standards and protocols developed by the PSP and the Federal Bureau of Investigation regarding the handling and testing of DNA evidence, and her testing results were accurate. While Appellant offered testimony from Dr. Goldstein to refute the Commonwealth's conclusions that the DNA evidence matched Appellant's DNA, the court noted that Dr.

Goldstein conceded that proper protocols and instructions were followed during testing, and it ultimately found his testimony regarding the inaccuracy of the results to be incredible.

Additionally, the PCRA court rejected Appellant's claim concerning the Commonwealth's use of the projector at trial, finding nothing false or misleading about the presentation of the DNA evidence or Gotwald's testimony. In reaching this conclusion, the court noted the Commonwealth never asked the jury to determine whether the DNA bands on the autorads matched the bands developed from Appellant's DNA sample. Rather, the Commonwealth placed the DNA samples on the projector to help illustrate Gotwald's testimony. The court opined that, while an expert may find the use of an overhead projector to be "a substandard and inappropriate means of analyzing RFLP autorads," that "does not preclude its use as a visual aid." PCRA Court Opinion, 9/4/12, at 73-74. Accordingly, as Appellant's underlying challenges lacked merit, the PCRA court concluded counsel was not ineffective for failing to raise them at the time of trial.

We agree that, by failing to lodge an objection at trial, Appellant waived his underlying challenges to the validity of the Commonwealth's DNA evidence and the manner in which this evidence was presented. See Pa.R.A.P. 302(a). We also note that Appellant waived his trial counsel ineffectiveness claim because he failed to raise it on direct appeal. However, because Appellant also alleges ineffectiveness of appellate counsel, we will proceed to evaluate his layered ineffectiveness claim.

As discussed above, the PCRA court found Dr. Goldstein's testimony to be incredible, noting that, although Dr. Goldstein disagreed with the results of Gotwald's testing, when he analyzed the results, he failed to view the autorads using a light box, the standard means utilized to illuminate autorads, and he did not dispute the PSP protocols

utilized during testing.[23]   Accordingly, because the PCRA court rejected Dr. Goldstein's testimony, there is no merit to Appellant's claim — based upon Dr. Goldstein's expert opinion — that counsel was ineffective for failing to challenge the results of Gotwald's DNA testing and analysis.   As a result, appellate counsel was not ineffective for failing to raise this meritless claim on direct appeal.   See Gwynn, 943 A.2d at 949.

### E.   Ineffectiveness of Counsel for Failing To Raise Due Process Violation

Appellant next raises a layered ineffectiveness claim that both trial counsel and appellate counsel were ineffective for failing to challenge on due process grounds an erroneous court order that was used to secure his temporary release from prison into the custody of detectives for questioning.

On October 14, 1997, before Appellant was charged in the instant case, a Delaware County Common Pleas Court judge ordered Appellant's temporary release from SCI-Camp Hill into the custody of detectives the next day for a "hearing."   No hearing was scheduled, however.   Rather, Delaware County Criminal Investigation Division ("CID") Detectives John Easton and Joseph O'Berg, along with Trooper Tedescung Bandy, arrived at SCI-Camp Hill the next day and informed Appellant that he was being transported to Delaware County to be questioned regarding the victim's murder.   Appellant agreed to accompany the police, was advised of his Miranda rights upon his arrival at the CID headquarters, and stated that he understood his rights and that

---

[23] Appellant also argues the PCRA court erred in rejecting Dr. Goldstein's testimony, claiming the PCRA court's credibility determination was "vague, and not supported by the record."   Appellant's Brief, at 51.   Contrary to Appellant's assertions, however, the PCRA court provided ample record support for its credibility determination, citing, *inter alia*, Dr. Goldstein's failure to examine the DNA autorads under standard forensic laboratory conditions and Dr. Goldstein's failure to find fault with the PSP protocols utilized in conducting the testing in this case.   PCRA Court Opinion, 9/4/12, at 71-73.

he was willing to discuss what he knew about the murder, indicating he wished to "clear his name."  Bomar I, 826 A.2d at 846.   Initially, Appellant cooperated and answered the investigators' questions; however, he grew upset when asked whether he had sexual intercourse with the victim and stated that he was not going to answer the question, choosing to invoke his Miranda rights at that time.

At trial, the court suppressed Appellant's response and all of his statements made following the invocation of his Miranda rights, but admitted all other statements made prior to the invocation.   On direct appeal to this Court, Appellant challenged the admission of the statements he made prior to invoking his Miranda rights on the grounds that the "bring-down" order used to secure his transfer to the CID headquarters violated his rights under the Fourth Amendment to the United States Constitution.   Specifically, Appellant asserted the Commonwealth falsely represented to the trial court that his presence was required at a hearing in order to secure his release into the detectives' custody for questioning.   We rejected Appellant's claim on direct appeal, stating "the notion of offensive or outrageous governmental conduct, not involving a seizure, sounds under due process, not the Fourth Amendment."   Bomar I, 826 A.2d at 846.

Apparently taking heed of our prior statement, Appellant presently argues, for the same reasons offered in his Fourth Amendment claim on direct appeal, that the Commonwealth violated his due process rights, claiming the CID investigators intentionally misrepresented the language in the "bring-down" order to "trick Appellant into 'voluntarily' going to Delaware County" for questioning.   Appellant's Brief at 56. Appellant further argues that both his trial counsel and direct appeal counsel were ineffective for raising a claim under the Fourth Amendment, rather than a due process challenge.

In response, the Commonwealth notes that, in rejecting Appellant's Fourth Amendment claim on direct appeal, we also opined that Appellant would not prevail on a due process claim, stating that "[A]ppellant was not misled regarding the true purpose of his transfer. The police specifically informed [A]ppellant that they would be transporting him to the CID offices to discuss the Willard murder and [A]ppellant expressly agreed to go with them." Commonwealth's Brief at 53 (quoting Bomar I, 826 A.2d at 846.) In light of the foregoing, the Commonwealth argues that Appellant cannot prove that he was intentionally misled regarding the "bring-down" order and, thus, cannot establish a viable due process claim. Further, as Appellant's due process claim lacks merit, the Commonwealth contends trial counsel and direct appeal counsel cannot be deemed ineffective for failing to raise it.

Agreeing with the Commonwealth, the PCRA court concluded Appellant's claim lacked merit, noting "there is no record evidence supporting the allegation that the error in the 'bring down' order was the result of 'false representations or other intentional wrongdoing on the part of the Commonwealth.'" PCRA Court Opinion, 9/4/12, at 183 (quoting Bomar I, 826 A.2d at 845). As such, the PCRA court found trial counsel and direct appeal counsel were not ineffective for failing to raise the claim.

Preliminarily, we note that Appellant has waived his underlying due process challenge because it was not raised by trial counsel, and he waived his trial counsel ineffectiveness claim because appellate counsel did not raise the claim on direct appeal. Accordingly, we evaluate only Appellant's claim of appellate counsel ineffectiveness.

Due process, in the most general sense, protects individuals from oppressive or arbitrary governmental conduct. See Commonwealth v. Kratsas, 764 A.2d 20, 27 (Pa. 2001) (citing Wolff v. McDonnell, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government")). When

evaluating whether an appellant's due process rights have been violated, we consider "whether the challenged proceeding or conduct 'offends some principal of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" Kratsas, 764 A.2d at 27 (quoting Patterson v. New York, 432 U.S. 197, 202 (1977)), and that "defines the community's sense of fair play and decency." Kratsas, 764 A.2d at 27 (quoting Dowling v. United States, 493 U.S. 342, 353 (1990)).

One specific subset of due process claims, raised in the instant case, concerns "outrageous government misconduct." Kratsas, 764 A.2d at 27. To establish such a due process violation, an Appellant must prove that such conduct was "so grossly shocking and so outrageous as to violate the universal sense of justice." Commonwealth v. Mance, 619 A.2d 1378, 1381 (Pa. Super. 1993) (quoting Commonwealth v. Benchino, 582 A.2d 1067 (Pa. Super. 1990) (quoting United States v. Ramirez, 710 F.2d 535, 539 (9th Cir. 1983))), aff'd, 652 A.2d 299 (Pa. 1995).

Appellant has failed to meet this burden. Although Appellant maintains he was "tricked" into going to CID headquarters, as we stated on direct appeal, Appellant failed to prove "the order was the result of false representations or other intentional wrongdoing on the part of the Commonwealth." Bomar I, 826 A.2d at 845. We stated further that "[A]ppellant was not misled regarding the true purpose of his transfer. The police specifically informed [A]ppellant that they would be transporting him to the CID offices to discuss the Willard murder and [A]ppellant expressly agreed to go with them." Id. at 846. Moreover, upon his arrival at CID headquarters, Appellant was advised of his Miranda rights and agreed to speak to investigators. Accordingly, while we do not suggest that the misuse of a court order could never violate an inmate's due process rights, we find nothing from the circumstances in the case *sub judice* that would indicate the Commonwealth acted offensively or outrageously so as to deny Appellant due process in

this instance. Because Appellant's underlying due process claim lacks merit, Appellant's claim that appellate counsel was ineffective for failing to raise the issue on appeal also fails.

### F. Denial of Impartial Jury

In an apparent claim of after-discovered evidence, Appellant next argues that jurors in his trial were tainted by a sheriff's deputy's statement concerning a threat that had been made to the jury, thus denying his constitutional right to a trial before a fair and impartial jury, seemingly invoking 42 Pa.C.S.A. § 9543(A)(2)(i). To support his claim, Appellant points to the following testimony from juror William Mertz introduced during the PCRA hearing:

> Q. At the time of the trial do you recall if the jury was being guarded by any law enforcement personnel?
>
> A. Yes.
>
> Q. Did you ever have a conversation with any of those law enforcement personnel regarding the amount of security around the jury?
>
> A. Yes.
>
> Q. And what were you told by that law enforcement officer during that conversation?
>
> A. During one conversation there was a mention of threats towards the jury.
>
> Q. Do you remember what that threat was?
>
> A. It has been awhile, I don't remember the specifics of that conversation at this point in time. I do remember there was [sic] threats.

N.T., 10/20/09, at 8-9. To refresh Mertz's recollection, Appellant's counsel showed Mertz a declaration that he previously signed regarding the threats. Counsel then asked:

Q: When I asked you earlier about the nature of the threat and you said you didn't recall. After reading this declaration is your recollection refreshed as to the threat?

A: In this declaration I state there were death threats towards the jury.

Id. at 10.

Appellant maintains that, because he did not know about the jury threat until "well after the trial," he had no opportunity to confront the information to which the jurors were exposed, and, thus, his rights under the Sixth and Fourteenth Amendments to the United States Constitution to a fair trial and due process were violated. Appellant's Brief at 61. Appellant further avers that the PCRA court misapplied the standard for evaluating whether an extraneous influence prejudiced the jury, claiming the PCRA court subjectively analyzed whether Appellant's jury was influenced by the statements, rather than evaluating whether an objective, typical juror would be affected by such an influence.

The Commonwealth retorts that the statement made by the sheriff's deputy concerned a security matter that had nothing to do with the issues at trial, and claims that "the information was neither inflammatory nor emotional in nature." Commonwealth's Brief at 57. The Commonwealth further maintains that Appellant's claim that the PCRA court applied a subjective standard, rather than an objective one, in assessing the impact of the deputy's statements is incorrect, as, according to the Commonwealth, the PCRA court noted both that the juror in question was not negatively impacted by the deputy's comments, *and* that "there was no reasonable likelihood of prejudice from the purported extraneous influence as a result of the conversation between a juror and deputy sheriff regarding security." Commonwealth's Brief at 57.

The PCRA court, in rejecting Appellant's claim, noted that the alleged extraneous influence occurred on only one occasion during the two and a half week trial, and opined that, "[t]here is no evidence indicating either that Mr. Mertz was led to believe that

[A]ppellant or anyone associated with him was the source of a threat." PCRA Court Opinion, 9/4/12, at 81. As such, the PCRA court concluded that Appellant could not prove the sheriff deputy's statement caused prejudice.

Initially, we note that Appellant does not state when he first learned of the alleged extraneous influence aside from baldly asserting that he learned of it "well after trial." Nor does he explain with any specificity why he waited until he filed his PCRA petition to raise the issue, rather than raising it at trial, in post-sentence motions, or on direct appeal. Thus, it appears Appellant waived this claim. Nevertheless, because the Commonwealth has not asserted waiver, we will proceed to consider the claim on the merits.

To prevail on a claim that an extraneous influence compromised the impartiality and integrity of the jury, Appellant must prove the extraneous influence caused a "reasonable likelihood of prejudice." Commonwealth v. Sneed, 45 A.3d 1096, 1115 (Pa. 2012) (internal quotations omitted). In determining whether there was a "reasonable likelihood of prejudice," we consider: "(1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature." Id. (quoting Carter by Carter v. U.S. Steel Corp., 604 A.2d 1010, 1016-17 (Pa. 1992) (plurality)). In employing this test, the reviewing court "is precluded from considering evidence concerning the subjective impact of an extraneous influence on any juror." Carter by Carter, 604 A.2d at 1016. Rather, the reviewing court "must determine how an objective, typical juror would be affected by such an influence." Id.

Here, Appellant has not met his burden of proving the sheriff deputy's statement caused a reasonable likelihood of prejudice. Appellant claims the threat was related to a

central issue in the case because his "character, dangerousness, and propensity for violence were all central issues of the Commonwealth's case," and the threat "would certainly be accepted by an objective juror that Appellant or his people could harm the jury." Appellant's Brief at 63. Initially, only in the broadest terms does the threat relate to a central issue in the case. However, even assuming, *arguendo*, a connection between the threat and a central issue in his case, Appellant's argument fails because he has not provided any proof that it was suggested that he or "his people" were the source of the threat. Rather, the record discloses only a report of a generic threat. Secondly, while the sheriff deputy's statement certainly provided Mertz with information that he did not have before him at trial, the statement was isolated, appears to have been directed only to Mertz, and constituted only the reference to a vague threat without any specifics. Further, Appellant does not provide any indication that the sheriff's deputy or Mertz relayed the information concerning the general threat to other members of the jury; thus, we cannot accept Appellant's claim that the entire jury was provided with information that they did not have before trial. Finally, while we agree with Appellant that a reference to a death threat may be intrinsically inflammatory, here, the threat was vague, its origins unknown, and it was conveyed by a sheriff's deputy to a single juror, rather than communicated to the jury directly from the source of the threat, thus minimizing its inflammatory nature.

Appellant is correct that, when conducting its analysis, at times, the PCRA court may have placed too much emphasis on the statement's effect on Mr. Mertz, rather than the effect it would have had on an objective juror. In light of the foregoing, however, including a report of an isolated, vague, and general threat conveyed by a neutral law enforcement officer to a single juror, we find there was no reasonable likelihood that an objective, typical juror would have been influenced by the threat; thus, regardless of the

PCRA court's consideration of subjective factors, the court ultimately reached the appropriate result. Accordingly, no relief is due on this claim.

### G. Improper Excusing of Prospective Jurors

Appellant contends the trial court improperly excused for cause seven potential jurors who stated they were philosophically opposed to the death penalty or expressed doubt regarding whether they could impose it, depriving him of the right to an impartial capital sentencing jury under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Appellant also raises a layered ineffectiveness claim arguing that trial counsel was ineffective for failing to object to the trial court's alleged improper death qualification process, and that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness on direct appeal.

The *voir dire* process at issue began with the trial court conducting a general *voir dire* of the entire pool of prospective jurors, followed by an individual *voir dire.* During the individual *voir dire*, the trial court, *inter alia*, explained the law regarding the imposition of the death penalty and asked each of the prospective jurors a series of questions related to his or her personal beliefs and ability to impose the death penalty. Specifically, the trial court asked each potential juror whether they had personal, religious, moral, ethical, or conscientious beliefs that would prevent them from voting to impose the death penalty under any circumstances, regardless of the facts or the law. Six of the seven veniremen at issue indicated they held such a belief. The trial court then asked whether the potential jurors were able to set aside these personal beliefs, and whether they would be able to vote to impose the death penalty if they believed the evidence warranted it and the law permitted it. After each of the six potential jurors indicated that they could not do so, the Commonwealth challenged the juror for cause — without objection from Appellant's

counsel — and the trial court granted the motion to strike them. N.T., 9/14/98, at 192-94; N.T., 9/15/98, at 471-73, 536-40, 607-10; N.T., 9/16/98, at 689-99, 761-63.

The seventh potential juror, I.H., was excused under circumstances that differed slightly from the others. During *voir dire*, the trial court asked I.H. the same question regarding whether she held beliefs that would prevent her from voting to impose the death penalty under any circumstances. I.H. responded that she was "for the death penalty," prompting the trial court to engage in the following exchange:

> Q. I mentioned a minute ago, I told you just because the Defendant's convicted of First Degree Murder, that doesn't mean that the jury may vote to impose the death penalty. They can't. They have to consider these aggravating and mitigating circumstances. So I'm asking you, essentially, would you follow the law and only impose the death penalty under those circumstances, if you believed --
>
> A. Yes.
>
> Q. -- that the evidence was there? Is that a yes?
>
> A. Yes.

N.T., 9/16/98, at 738. Thereafter, Appellant's counsel questioned I.H. further regarding the following:

> Q. Ma'am, as you sit here today, have you formed some opinion as to the guilt or innocence of Mr. Bomar?
>
> A. No, but what I say now might not fit him.
>
> Q. Okay.
>
> A. After watching that other case, O.J. Simpson's case, --
>
> Q. Yes ma'am.
>
> A. -- a couple of years ago, I really feel I would not like to be involved in a case like this.

Q. You would not like to be involved?

A. I would not like to be.

Q. Okay. We just want your honest opinion.

A. My honest opinion is to watch this circus of O.J. Simpson, the whole thing, and I watched afterwards, you know, all them comments like different TV people, like Larry King had certain people on and et cetera, et cetera. I wish not to be a juror in a murder case.

Q. Okay. Do you think that because Mr. Bomar has been arrested and charged with the crime of Murder that he's probably guilty of something?

A. I don't even look at this. I just would not wish to do this, the whole, to do that. I wish not to do this. It would be, I don't even look at Mr. Bomar or, everybody's going to be disappointed in the way I feel but I wish not to do it.

Q. Okay. Your personal feelings about not wanting to participate in the process, --

A. Yes.

Q. -- would that affect your ability to sit as a fair and impartial juror in the case?

A. I just have this block. I do not want to do it.

Id. at 741-42. The Commonwealth requested that I.H. be excused for cause. Appellant's counsel did not object, and the trial court granted the Commonwealth's motion.

Although Appellant's counsel did not object to the Commonwealth's motions to excuse any of the seven veniremen, Appellant nevertheless maintains the trial court improperly struck the potential jurors based upon their initial feeling that they could not impose the death penalty, and thereby failed to conduct the required inquiry into whether their views would "prevent or substantially impair the performance of [their] duties as . . .

juror[s] in accordance with [their] instructions and [their] oath." Appellant's Brief at 65 (quoting Morgan v. Illinois, 504 U.S. 719, 728 (1992)). As a result, Appellant claims that prospective jurors who may have been opposed to the death penalty, but were qualified to sit as jurors, were excluded, resulting in the selection of a jury that was "uncommonly willing to condemn a man to die," and undermining confidence in his death sentence, necessitating a new sentencing hearing. Appellant's Brief at 66 (quoting Witherspoon v. Illinois, 391 U.S. 510, 521 (1968)). Appellant also contends trial counsel was ineffective for failing to object to the Commonwealth's motions to strike each of the seven jurors and for failing to rehabilitate each of the seven jurors, and he argues that appellate counsel was ineffective for failing to raise this claim on direct appeal.

The PCRA court wholly rejected Appellant's claim, noting that, contrary to Appellant's assertions, the trial court thoroughly determined whether each prospective juror had the ability to perform his duties in accordance with his or her oath. PCRA Court Opinion, 9/4/12, at 192. The court noted that, in so doing, it explained to each potential juror the process of considering and weighing the aggravating and mitigating circumstances in deciding whether to impose a sentence of death and specifically questioned each potential juror whether his or her beliefs would prevent or substantially impair the juror in the performance of his or her duties in accordance with his instructions and their oath. The court found that it did not abuse its discretion in using this method to exclude potential jurors, and, therefore, concluded that neither trial counsel nor appellate counsel were ineffective for failing to pursue this claim.

Because Appellant's counsel failed to object to the Commonwealth's motions to strike each of the seven potential jurors, this claim is waived. We also find that Appellant waived his trial counsel ineffectiveness claim because appellate counsel failed to raise

the issue on direct appeal. We, thus, proceed to evaluate only Appellant's claim of appellate counsel ineffectiveness.

In determining whether a prospective juror should be disqualified for cause, a trial court must consider "whether he or she is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence." Commonwealth v. Robinson, 864 A.2d 460, 489 (Pa. 2004). While "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction," Commonwealth v. Gibson, 951 A.2d 1110, 1129 (Pa. 2008) (quoting Witherspoon, 391 U.S. at 522), it is well settled that a trial court may disqualify a potential juror for cause if his views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Chmiel, 30 A.3d at 1176. However, "[t]he decision whether to disqualify a juror is within the sound discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion." Commonwealth v. Stevens, 739 A.2d 507, 521 (Pa. 1999).

Here, Appellant fails to establish the trial court abused its discretion. Appellant baldly asserts the trial court failed to determine whether the potential jurors could set aside their beliefs and follow the law, but he fails to cite to anywhere in the record where this occurred, fails to explain why, specifically, the trial court's *voir dire* was inadequate, and fails to discuss the *voir dire* of each of the jurors individually. Moreover, Appellant ignores that the trial court asked each of the excused jurors whether they held beliefs that would prevent them from imposing the death penalty under any circumstances; specifically asked each of them whether they could set aside their personal beliefs and impose the death penalty if the facts and law counseled toward it; and excused the jurors

only after they indicated they could not. We find that this inquiry sufficiently established that the six excused jurors who expressed that they could not vote to impose the death penalty lacked the ability to perform their duties in accordance with the judge's instructions and their oath, and, thus, that the trial court properly exercised its wide discretion in excusing these jurors for cause.

Similarly, we decline to find the trial court abused its discretion in excusing I.H. for cause. As stated above, "[j]urors should be disqualified for cause when they do not have the ability or willingness to eliminate the influences under which they are operating and therefore cannot render a verdict according to the evidence." Robinson, 864 A.2d at 489. Even assuming *arguendo* that I.H. had the ability to render a verdict according to the evidence, based upon I.H.'s repeated comments regarding her passionate desire not to participate in a murder case; her statement that she "ha[d] this block" and did "not want to do it," in response to the trial court's question regarding whether her personal feelings would affect her ability to sit as a fair and impartial juror; and her reference to the jurors in the O.J. Simpson trial, it was reasonable for the trial court to conclude that I.H. was simply *unwilling* to set her feelings aside and render a verdict according to the evidence in this case.

Accordingly, in light of the foregoing, we conclude the trial court did not abuse its discretion in excusing the jurors for case. Further, because this claim lacks merit, we also find that appellate counsel was not ineffective for failing to raise a claim of trial counsel's ineffectiveness on direct appeal. We further note that trial counsel "has no constitutional obligation to attempt to change the jurors' views"; thus, to the extent that Appellant argues trial counsel was ineffective for failing to rehabilitate the jurors, this claim also lacks merit. Chmiel, 30 A.3d at 1176.

### H. Violation of Sixth Amendment Right to Counsel

Appellant maintains the Commonwealth's placement of O'Donald on his cellblock to serve as a listening post for statements regarding Appellant's involvement in the victim's murder violated his Sixth Amendment right to counsel. While Appellant concedes that formal judicial proceedings had not been initiated against him at the time O'Donald overheard the incriminating statements, and, thus, that, pursuant to Massiah v. United States, 377 U.S. 201 (1964), his Sixth Amendment right to counsel had not yet attached, he suggests the Commonwealth's actions of planting O'Donald to elicit statements from him prior to being formally charged violated the "spirit" of the Massiah doctrine, and urges this Court to "revisit and reject the established legal doctrine" in order to prevent such conduct by the Commonwealth in the future. Appellant's Brief at 67.

In response, the Commonwealth highlights that Appellant has no right to federal constitutional relief, as judicial proceedings had not been initiated against him at the time he made the incriminating statements and, thus, his Sixth Amendment rights were not implicated. The Commonwealth further observes that Appellant conceded that fact on direct appeal when he raised this claim pursuant to Article I, Section 9 of the Pennsylvania Constitution, rather than pursuing a claim on federal constitutional grounds.

Appellant did not raise this issue on direct appeal, and, thus, we find it to be waived. Moreover, even if Appellant had raised this issue, as the PCRA court noted, this Court in addressing — and rejecting — Appellant's related claim under Article I, Section 9 of the Pennsylvania Constitution on direct appeal opined that Appellant also had no federal right to relief. Specifically, we noted that the "right to counsel under Article I, Section 9 of the Pennsylvania Constitution . . . is coterminous with the Sixth Amendment right to counsel" for purposes of determining when the right to counsel attaches. Bomar I, 826 A.2d at 844. We then reasoned that because "[A]ppellant had no Sixth

Amendment right to counsel at the time he made his incriminating statements to O'Donald concerning the Willard murder, he also necessarily had no Article I, Section 9 right to counsel at this point." Id.

As we did on direct appeal, we again emphasize that Appellant was not charged in the instant murder at the time he implicated himself to O'Donald, and, thus, his right to counsel under the Sixth Amendment had not attached at that time. See Massiah, 377 U.S. at 205. To the extent Appellant now suggests that we should "reject" the Massiah doctrine, we must decline his invitation to do so, as this Court obviously lacks the authority to overrule decisions of the United States Supreme Court premised on federal law. Appellant is, thus, entitled to no relief on this claim.

## I. Cumulative Effect of Errors

Lastly, Appellant argues that, even if he is not entitled to relief on any of his individual claims, he is entitled to relief based on the cumulative effect of the allegations of error and counsel ineffectiveness raised in his brief, which he claims denied him a fair trial and reliable capital sentencing. It is well settled that "no number of failed claims may collectively warrant relief if they fail to do so individually." Commonwealth v. Washington, 927 A.2d 586, 617 (Pa. 2007). Accordingly, where claims are rejected for lack of arguable merit, there is no basis for an accumulation claim. Commonwealth v. Sattazahn, 952 A.2d 640, 671 (Pa. 2008). However, when the failure of individual claims is grounded in lack of prejudice, the cumulative prejudice from those individual claims may properly be assessed. Commonwealth v. Koehler, 36 A.3d 121, 161 (Pa. 2012) (citations omitted).

In the instant case, we have denied all of Appellant's claims on the grounds that they are waived, lack merit, or both; thus, there is no basis for a claim of cumulative error.

Moreover, even if Appellant did not waive his claims, we rejected only two of his claims — his Brady claim and his claim that penalty phase counsel was ineffective for failing to present additional mitigating evidence — on the alternative ground of lack of prejudice. Upon review, we are confident in light of the overwhelming DNA and circumstantial evidence implicating Appellant in this murder outlined above that there is no cumulative error warranting relief.

### III.  Conclusion

In conclusion, for the reasons stated herein, we affirm the order of the PCRA court dismissing all of Appellant's claims.

Messrs. Justice Saylor, Eakin, Baer and Stevens join the opinion.

Mr. Chief Justice Castille files a concurring opinion.

Mr. Justice Saylor files a concurring opinion.