J-S50018-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
DAVID FRANK STAHL :
:
Appellant : No. 35 WDA 2019

Appeal from the PCRA Order Entered December 6, 2018
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0001233-2012

BEFORE: LAZARUS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.: **FILED OCTOBER 08, 2019**

David Frank Stahl (Appellant) appeals from the order dismissing his

petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A.

§§ 9541-9546. We affirm.

> The charges in this case arose from the death of Rebecca Stahl
> [(Victim)], whose body was located on February 24, 2012 in a
> rural area of Unity Township, Westmoreland County. The
> discovery of her body was the result of an investigation into the
> disappearance of [Victim], who had been reported missing by her
> father, Kenneth Anderson, on February 21, 2012. The evidence
> presented at trial established that [Victim] had lived in Hempfield
> Township, just outside of Greensburg, with her husband,
> [Appellant]. The evidence also suggested that their marriage was
> not always a happy one. . . .
>
> . . . Pennsylvania State Troopers began an investigation of the
> missing person's report, talking with [Victim's] sister, Kelly Beltz,
> and [Appellant]. [Appellant] reported that he had last had contact
> with [Victim] on Monday, February 20, 2012, when they had had

---

[*] Retired Senior Judge assigned to the Superior Court.

a conversation via text regarding their bank debit card. [Appellant] told [Trooper] Laird that [Victim] was gone when he had returned home from Lowe's, a large home improvement store. Kelly Beltz advised [Trooper] Laird that it was unlikely that [Appellant] was unaware of [Victim's] whereabouts, because he was very controlling. [Appellant] allowed [Trooper] Laird to walk through the residence, but at that time, he did not locate [Victim].

\* \* \*

Further investigation and interviews led the Pennsylvania State Police to ask [Appellant] for consent to search his residence on the morning of February 22, 2012. [Appellant] consented to a search of the residence and signed a written consent for them to do so. At that time, a state trooper also photographed numerous injuries that could be seen on [Appellant's] face. A search of the residence revealed a number of concerning items, including evidence of recent repairs done in the bathroom and the basement area of the home. State troopers also noted a number of inconsistencies in [Appellant's] statements to them, and [Appellant] became a "person of interest." The State Police then applied for and obtained a search warrant signed by Judge Debra Pezze of the Court of Common Pleas of Westmoreland County and returned to the [Appellant's] residence later that afternoon. During this search, a plastic garbage bag was found in a basement freezer. Inside this garbage bag was a separate bag that contained personal items belonging to [Victim], and another bag that contained partially burned identification and medical information for [Victim]. Inside another bag were hiking boots and other items of what appeared to be men's clothing. Troopers also noted evidence of plant material that they believed to be arborvitae leaves. Troopers also collected other evidence from the home, including a clump of reddish-brown hair that was found on top of a paper shredder in the basement. Troopers also treated the basement area with luminol and leuco crystal violet, which revealed several areas of suspected blood evidence. They photographed and collected samples from the areas that showed fluorescence, indicating the possibility of the presence of blood.

Trial Court Opinion, 2/19/15, at 1-3 (citations omitted).

On February 27, 2012, Appellant was arrested and charged with one count of first-degree murder. On February 29, 2012, while in the local county

jail, Appellant contacted police and asked to speak to them. Appellant was advised of and waived his **Miranda**[1] rights. During the interview, Appellant admitted to killing his wife, but maintained that he only did so while acting in self-defense after Victim tried to stab him with a knife during an argument. Appellant explained that on February 18, 2012, he began drinking at Frontier Club, a bar, after running errands earlier that day. Around 12:30 p.m., Appellant met friends at another bar, Kowboys, where he stayed until 7:00 p.m. After Appellant returned home, he and Victim began to argue. Appellant left the house and met friends at Whitney, another local bar. Appellant did not return home until 12:30 a.m. the following morning.

In describing his level of intoxication, Appellant made the following statements to police:

[State Police Trooper #1]: Um and then you arrived back later that night sometime around midnight, is that correct?

[Appellant]: Yes.

[State Police Trooper #1]: You say you weren't intoxicated?

[Appellant]: Not heavily no. I was intoxicated but not heavily.

[State Police Trooper #1]: You knew what was going on?

[Appellant]: Yes.

[State Police Trooper #1]: You drove home?

[Appellant]: Yes.

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

[State Police Trooper #1]: Felt safe to drive home?

[Appellant]: Yes sir.

[State Police Trooper #1]: What was you drinking at the bar?

[Appellant]: Beer.

[State Police Trooper #2]: Just beer? Do you drink anything else? Do you drink anything else there?

[Appellant]: There are times I'll drink mix drinks.

[State Police Trooper #2]: What mix drink?

[Appellant]: Captain Morgan.

[State Police Trooper #1]: Did you have any on Saturday?

[Appellant]: I don't think I did.

[State Police Trooper #1]: You drank nothing but beer? What type of beer?

[Appellant]: Bud Light.

[State Police Trooper #1]: Bottle or draft?

[Appellant]: In Saturday – in the afternoon I was drinking draft but the night time I would have been drinking bottle.

[State Police Trooper #1]: Over the course of that day how many um drafts or bottles do you think you had?

[Appellant]: Six or seven drafts during the afternoon, and maybe four or five bottles at night time.

[State Police Trooper #1]: Okay, and like you said you didn't feel like you were impaired at all?

[Appellant]: No sir.

N.T., 6/26/14, at 532-34, Ex. 170A.

Appellant recounted that upon his return home, he and Victim got into another argument. At some point, Victim grabbed a knife. During the altercation, Appellant and Victim fell to the floor and Victim dropped the knife. Appellant then grabbed Victim's throat and strangled her to death. He explained that, afterwards, he panicked, hid her body in the bushes near Latrobe Airport and threw away her purse and cell phone.

On June 27, 2014, a jury found Appellant guilty of first-degree murder. The trial court sentenced Appellant to a mandatory sentence of life in prison without parole. On July 24, 2014, Appellant filed a post sentence motion, which the trial court denied on December 16, 2014. Appellant filed a timely appeal and this Court affirmed his judgment of sentence. *Commonwealth v. Stahl*, 1 WDA 2015 (Pa. Super. Nov. 29, 2016) (unpublished memorandum). Appellant filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which was denied on June 20, 2017.

On August 21, 2017, Appellant filed the underlying PCRA petition. Counsel was appointed, and filed an amended petition on December 8, 2017, raising claims on ineffective assistance of counsel. On September 17, 2018, the PCRA court held a hearing on Appellant's petition. On December 6, 2018, the PCRA court dismissed Appellant's petition. This timely appeal followed. Both Appellant and the PCRA court have complied with Pennsylvania Rule of Appellate Procedure 1925.

On appeal, Appellant presents the following issues for review:

I.   WHETHER APPELLANT'S PRIOR COUNSELS WERE INEFFECTIVE, WHICH IN THE CIRCUMSTANCES OF THE PARTICULAR CASE, SO UNDERMINED THE TRUTH DETERMINING PROCESS THAT NO RELIABLE ADJUDICATION OF GUILT OR INNOCENCE COULD HAVE TAKEN PLACE.

II.   WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S PCRA PETITION AFTER THE HEARING AS THE RECORD CLEARLY ESTABLISHED THAT APPELLANT'S PRIOR COUNSELS WERE INEFFECTIVE FOR FAILING TO PURSUE A VOLUNTARY INTOXICATION DEFENSE.

Appellant's Brief at 5.

We review the denial of PCRA relief by "examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error." *Commonwealth v. Busanet*, 54 A.3d 35, 45 (Pa. 2012). "Our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the party who prevailed in the PCRA court proceeding." *Id.*

Both of Appellant's issues involve allegations of ineffective assistance of counsel. In deciding ineffective assistance of counsel claims, we begin with the presumption that counsel rendered effective assistance. *Commonwealth v. Bomar*, 104 A.3d 1179, 1188 (Pa. 2014). To overcome that presumption, the petitioner must establish: "(1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different." *Id.* (citation omitted). To

demonstrate prejudice in an ineffective assistance of counsel claim, "the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Commonwealth v. King*, 57 A.3d 607, 613 (Pa. 2012). If the petitioner fails to prove any of these prongs, the claim is subject to dismissal. *Bomar*, 104 A.3d at 1188.

Appellant argues that his trial counsel, Donna J. McClelland, Esquire and Matthew R. Schimizzi, Esquire (collectively, Counsel), were ineffective for failing to request a jury instruction on voluntary intoxication. Specifically, Appellant asserts that Counsel raised the issue of Appellant's intoxication during trial, but failed to request a jury instruction. Although Appellant admitted that he murdered Victim, Appellant contends that he lacked the specific intent to be convicted of first-degree murder due to his intoxication. Appellant's Brief at 18. Accordingly, Appellant suggests that Counsel were ineffective for failing to request a jury instruction on voluntary intoxication.

A defense of diminished capacity negates the element of specific intent, and thus mitigates first-degree murder to third-degree murder. *Commonwealth v. Williams*, 980 A.2d 510, 527 (Pa. 2009); *Commonwealth v. Saranchak*, 866 A.2d 292, 299 (Pa. 2005). The mere fact of voluntary intoxication does not give rise to a diminished capacity defense. Rather, to prove diminished capacity due to voluntary intoxication, a defendant must show that he was overwhelmed to the point of losing his faculties and sensibilities. *Commonwealth v. Blakeney*, 946 A.2d 645, 653

(Pa. 2008); ***Commonwealth v. Spotz***, 896 A.2d 1191, 1218 (Pa. 2006). Evidence that the defendant lacked the ability to control his or her actions or acted impulsively is irrelevant to specific intent to kill, and thus is not admissible to support a diminished capacity defense. ***Commonwealth v. Vandivner***, 962 A.2d 1170, 1183 (Pa. 2009).

Our Courts have made clear that a jury instruction regarding diminished capacity due to voluntary intoxication is justified **only** when the record contains evidence that the accused was intoxicated to the point of losing his or her faculties or sensibilities. ***Commonwealth v. Reiff***, 413 A.2d 672, 674 (Pa. 1980). Evidence that the accused ingested alcohol or intoxicating drugs – without more – does not warrant a voluntary intoxication instruction. ***Id.***

At the PCRA hearing, Attorney McClelland and Attorney Schimizzi testified about their decision not to request a jury instruction on voluntary intoxication. Counsel testified that they met with Appellant to consider whether his intoxication might have affected his ability to form intent. Counsel testified that Appellant "couldn't state a specific number of drinks that he had consumed that day." PCRA Hearing, 9/17/18, at 28; ***see also*** PCRA Hearing, 9/17/18, at 8-9. Counsel noted that Appellant could not provide any receipts or credit card statements to document the amount of alcohol he had consumed. Likewise, Appellant informed Counsel that "he was not intoxicated, at least so he believed, when he came home that night." ***Id.***

Further, Attorney McClelland provided the following testimony regarding other efforts utilized to investigate a voluntary intoxication defense:

*Attorney McClelland*: . . . We did speak to some friends of [Appellant], and I remember speaking with at least one bartender and maybe two bartenders because [Appellant] had related to the police in interviews and he told us where he had been drinking earlier that day.

*Appellant's PCRA Counsel*: From your recollection, do you recall about how long [Appellant] indicated he had been drinking that day?

*Attorney McClelland*: I think it was off and on all day.

*Appellant's PCRA Counsel*: For over 12 hours?

*Attorney McClelland*: I think it started late morning because he had his kids in the morning and had to drop them off or his mom picked them up, and he started drinking after the kids left and continued drinking until he got home and got into an argument with [the Victim] that led to her death.

*Appellant's PCRA Counsel*: In your conversations, did you discuss with [Appellant] what particular kind of alcohol he was consuming?

*Attorney McClelland*: Yes.

*Appellant's PCRA Counsel*: What was that, if you recall?

*Attorney McClelland*: I don't remember. I think it was whiskey. I think beer and some mixed drinks. I did not review my notes on that. Again, [Attorney] Schimizzi has been taking notes on the intoxication part of this case.

*Appellant's PCRA Counsel*: Now, these witnesses that you interviewed, would you agree that these witnesses were not with [Appellant] the entire 12 hours?

*Attorney McClelland*: That's correct. [Appellant] had come home at one point and then left again. He had spent some time shooting pool I believe at a bar with his friends. It was just an off and on all day drinking but with different people in different bars as a matter of fact.

*Appellant's PCRA Counsel*: So not one of these particular witnesses would have been drinking with him all 12 hours?

*Attorney McClelland*: My recollection was that there was no one with him from start to finish.

*Appellant's PCRA Counsel*: Now, based on your conversation with the individual, did you ever hire an expert?

*Attorney McClelland*: No, we did not.

*Appellant's PCRA Counsel*: Your reason?

*Attorney McClelland*: We were not able to get enough information that it would be worthwhile. I do remember speaking with Dr. Winek, who at that time was still a practicing toxicologist. He said, no, you need more detail than what you have. You need about exactly the size of the drinks, what was in the drinks, how many drinks and when the last drink was consumed. We had trouble pinning all of that down.

PCRA Hearing, 9/17/18, at 10-12.

Attorney Schimizzi corroborated Attorney McClelland's testimony pertaining to Counsels' investigation into the voluntary intoxication defense. Regarding Appellant's intoxication, Attorney Schimizzi testified:

*The Commonwealth*: And that [Appellant] was asked, you say you weren't intoxicated. And his answer was not heavily, no. I was intoxicated but not heavily.

He was also asked, you drove home. And he said, yes.

He was asked if he felt safe to drive home. He said, yes?

*Attorney Schimizzi*: Yes, that's correct.

*The Commonwealth*: So his own words to the troopers, you know, approximately ten days after the homicide was committed were that he wasn't heavily intoxicated, isn't that true?

*Attorney Schimizzi*: That's correct.

- 10 -

*The Commonwealth*: And did you understand that in terms of presenting an intoxication defense that you would have to overcome his own words that he wasn't heavily intoxicated, that he was able to drive?

*Attorney Schimizzi*: Yes, absolutely. That was something that we considered.

\* \* \*

*The Commonwealth*: Now, what did you perceive to be [Appellant's] defense to this homicide?

*Attorney Schimizzi*: Our focus was on a voluntary manslaughter defense.

*The Commonwealth*: Based upon what circumstances that were presented during trial?

*Attorney Schimizzi*: Based upon the evidence that [Victim] had a knife, that it was a heated dispute between the two of them. You know, just the whole instance, the fighting back and forth. That's what we considered or what I considered.

*The Commonwealth*: In other words, he perceived himself to be in danger of serious bodily injury and that's why he killed her?

*Attorney Schimizzi*: Correct. I know that –

*The Commonwealth*: Imperfect self-defense?

*Attorney Schimizzi*: Imperfect self-defense. I know [Attorney] McClelland and I had discussed going back and forth to proving an imperfect self-defense or is it a heat of passion. Those were the two different angles that we were considering, and ultimately it was imperfect self-defense.

*The Commonwealth*: Based on the investigation that was done by the State Police, it's true that they had attempted to interview a number of people who were at the bar, bartenders, bar patrons where the defendant had been on the night of the homicide, isn't that correct?

- 11 -

*Attorney Schimizzi*: Correct.

*The Commonwealth*: And is it fair to say, based on all those interviews, there at least wasn't any evidence from those interviews that [Appellant] was intoxicated to a great extent?

*Attorney Schimizzi*: Not that I recall.

*The Commonwealth*: And then you, [Attorney] McClelland and Mr. Lauder also did an investigation and you could not find any witnesses who could provide the level of [Appellant's] intoxication, is that right?

*Attorney Schimizzi*: No. I know Mr. Lauder and I went to Kowboys and we were not able to – they were uncooperative. They wouldn't give us any information.

*The Commonwealth*: Was he last at the Whitney Club, is that your recollection?

*Attorney Schimizzi*: That's my recollection.

*The Commonwealth*: And you spoke to the bartender at the Whitney Club. We're differing on what her name is, but you think you spoke to the last person who served him at the Whitney Club?

*Attorney Schimizzi*: That's who I am referring to, yes.

*The Commonwealth*: She basically, if I can summarize it and you correct me if I'm wrong, she wasn't able to provide any evidence as to the level of his intoxication with any certainty?

*Attorney Schimizzi*: No. That would be correct. With her statements not having any concern about him driving home, you know, him not staggering, you know, anything like that, she was unable to provide any information.

*The Commonwealth*: Based on your investigation that you conducted, based on the discovery that was provided by the Commonwealth as to the State Police investigation and your experience as a lawyer and [Attorney] McClelland's experience as well, was it your opinion you did not have a defense of voluntary intoxication that would reduce first degree to third degree?

*Attorney Schimizzi*: That was the decision we made, yes, that the voluntary manslaughter argument was better than – it was a better defense strategy that he had diminished capacity because we didn't have the evidence for –

*The Commonwealth*: Well, it was a strategic decision to argue voluntary manslaughter rather than argue third degree based on voluntary intoxication?

*Attorney Schimizzi*: Correct.

PCRA Hearing, 9/17/18, at 35-39.

In rejecting Appellant's ineffective assistance of counsel claim, the PCRA

Court stated:

It is abundantly clear from the testimony of defense counsel at the evidentiary hearing that they went to great lengths to pursue all possible avenues of defense for [Appellant]. Counsel interviewed witnesses, traveled to the bars that [Appellant] visited prior to [Victim's] murder, and spoke to experts who could have potentially bolstered such defenses. Based on all available information, Attorney McClelland testified that it was her belief that while she could certainly ask the jury to consider [Appellant's] intoxication at the time of the murder, such evidence did not reach the threshold of diminished capacity due to voluntary intoxication. Indeed, [Appellant's] own statements to officers belie his contention that a diminished capacity defense should be [*sic*] have been presented, as he informed officers that he was able to drive home, and that while he was indeed intoxicated, he did not feel "impaired." [Appellant's] contentions that his counsel was ineffective is not supported by a scintilla of evidence in the record; indeed the record reflects that his counsel thoughtfully and thoroughly examined all evidence available, and came to the realistic conclusion that [ ] a voluntary intoxication defense may not have been reasonable . . . .

PCRA Court Opinion, 12/6/18, at 17-18.

We agree. At Appellant's PCRA hearing, Counsel testified that they

conducted a thorough investigation to determine the type of alcohol Appellant

- 13 -

ingested, the amount of alcohol, and the specific time frame over which Appellant drank on the night of the murder. Counsel interviewed multiple bar patrons, friends of Appellant, and the bartenders who served Appellant to determine whether Appellant had a viable voluntary intoxication defense. PCRA Hearing, 9/17/18, at 12. Mindful of the limited information Counsel received from their investigation, and in conjunction with Appellant's statements to police that he was not heavily intoxicated, Counsel made the strategic decision to pursue an imperfect self-defense, rather than a diminished capacity defense.

Counsel's decision to forego a voluntary intoxication defense was reasonable and did not prejudice Appellant. While Appellant suggests that any evidence of alcohol consumption is sufficient to justify a jury instruction on voluntary intoxication, Appellant's Brief at 20, our law is clear that a jury instruction regarding diminished capacity due to voluntary intoxication is justified **only** when the record contains evidence that the accused was intoxicated to the point of losing his or her faculties or sensibilities. *Reiff*, 413 A.2d at 674. Accordingly, as Counsel's failure to seek a jury instruction on voluntary intoxication was reasonable and did not prejudice Appellant, the PCRA court did not abuse its discretion in dismissing Appellant's ineffective assistance of counsel claim. *See Bomar*, 104 A.3d at 1188.

Order affirmed.

J-S50018-19

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  10/8/2019